UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
NO. 1:21-CR-373

_____

UNITED STATES OF AMERICA,


v.


TIMOTHY JAY NORMAN

_____


**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................3

FACTS ................................................................................................................4

    A.   Background ...............................................................................................4

        1.   Lifelong gun collector Timothy Norman joins the Highway Patrol. ........4

        2.   Structure and discipline in the Highway Patrol............................5

    B.   Federal agents use aerial drone surveillance technology, concealed recording devices, and a confidential informant to record Norman selling guns from his collection. ...................................................................6

    C.   First Sergeant Catherwood orders Norman to appear at headquarters............7

    D.   Federal and state agents arrive to interrogate and arrest Norman. ..................8

    E.   State and federal agents enter the headquarters and shuffle Norman into the First Sergeant's office for an interview.......................................8

    F.   Norman passes out, wakes up in handcuffs, and signs away his badge after an ambulance shows up to take him to the hospital. ..........................9

ARGUMENT....................................................................................................10

    I.   This Court must suppress Norman's statements under *Garrity v. New Jersey* because the trifecta of Trooper-SBI-ATF authority created a penalty situation when they levied the implied threat that Norman's failure to participate in the interview would result in a substantial penalty. ..................11

    II.   This Court must suppress Norman's non-*Mirandized* statements because having one's car blocked in and his weapons confiscated by a trifecta of higher-ranking authority are hallmarks of custody. ...........................................16

REQUEST FOR A HEARING ..........................................................................23

CONCLUSION.................................................................................................24

CERTIFICATE OF SERVICE ..........................................................................25

## PRELIMINARY STATEMENT

The case before the Court involves charges that Defendant Tim Norman, while an active member of the North Carolina Highway Patrol, sold firearms to one or more buyers he knew or should have known were felons and engaged in such conduct without the appropriate federal license. The instant motion asserts the relevant state and federal authorities, in possession of a Middle District arrest warrant, failed to provide Norman with required warnings prior to interviewing and arresting him at his Greensboro patrol headquarters and evidence from the interview should be suppressed.

Decades before he was sworn in, Norman developed an affinity for hunting and collecting rare firearms. His collection has grown over the years and includes special edition hunting rifles and taxidermic animals that line the walls of his family's home.

Now, his lifelong hobby has raised the specter of several years in federal prison. Having been an avid gun collector, hobbyist, and enthusiast for decades, the Government has accused Norman of engaging in the business of selling firearms for profit without a license during a compressed timeframe of six months in 2021. Those infrequent sales, the Government claims, were made to one or more men that were prohibited from possessing firearms.

After securing an arrest warrant, a conglomerate of state and federal law enforcement officers spent a week planning their takedown. A high-ranking sergeant ordered Norman to appear at the Highway Patrol headquarters where he was directed to surrender his service weapon and taser as Agents roared up in a black Chevy Tahoe

to blockade Norman's patrol car and approached him from the only available exit. Trapped from leaving and stripped of the tools he needed to continue his normal work, Norman felt he was not free to leave and had no choice but to speak with the agents or he would be fired.

Norman now asks this Court to suppress those statements to protect his Fifth Amendment right to be free from self-incrimination.

First, this Court should suppress his statements under *Garrity v. New Jersey* because law enforcement created a penalty situation when they levied the implied threat that Norman's failure to participate in the interview would result in a substantial penalty.

Second, this Court should suppress Norman's statements under *Miranda v. Arizona* because having one's car blocked in and his weapons confiscated by a trifecta of higher-ranking authority are hallmarks of custody.

## FACTS

### A.    Background

#### 1.    Lifelong gun collector Timothy Norman joins the Highway Patrol.

Timothy Jay Norman has been an avid gun collector and enthusiast for his entire life.  *See* Declaration of Timothy Norman (the "Norman Decl.") ¶ 2.  His collection includes various special edition and rare items spanning from hunting rifles and revolvers, to knives and rifle bags, to optics and taxidermic animals.  *Id.*

4

Norman served as a sworn law enforcement officer with the North Carolina State Highway Patrol for almost nine years. *Id.* at ¶ 3. Based out of Guilford County, Norman's duties included supervising the roadways, making stops and arrests of drivers suspected of driving while intoxicated, and rendering support and emergency services to victims of car accidents. *Id.* at ¶ 3. In his nine years of service, Norman accumulated zero complaints, faced zero disciplinary action, and was the subject of zero lawsuits. *Id.* ¶ 5. His file is papered with letters from arrestees, victims, and others who have expressed gratitude for Norman's tempered, fair, and respectful demeanor and handling of encounters on the roadways. *Id.* at ¶ 5. Norman was part of Troop D2. *Id.* at ¶ 3.

### 2. Structure and discipline in the Highway Patrol.

The Highway Patrol is broken down by "troop" and then district. There are eight lettered troops. The various districts within each troop embrace one or more counties. Each district is headed up by a first sergeant. *Id.* at ¶ 3-4, 6.

The first sergeant oversees the sergeants, troopers, and administrative personnel for the entire troop. *Id.* at ¶ 4. The first sergeant at Troop D2 was First Sergeant Grady C. Catherwood. *Id.* at ¶ 6.

Discipline is strict in the Highway Patrol. First Sergeant Catherwood had the power and authority to terminate and discipline troopers in Guilford County. *Id.* at ¶ 6. One example of a disciplinary measure First Sergeant Catherwood could impose was to put a trooper on "desk duty." *Id.* at ¶ 6. Desk duty means a trooper spends an indefinite period working strictly from the office. *Id.* at ¶ 6. The trooper's service

5

weapon, badge, taser, and patrol car are all confiscated during this period and the trooper cannot wear his uniform to work. *Id.* at ¶ 6. Norman has seen this happen to other troopers. *Id.* at ¶ 6. Desk duty is often a preliminary measure taken before a trooper is investigated and, if necessary, fired. *Id.* at ¶ 6.

In addition to First Sergeant Catherwood's authority, the State Bureau of Investigation has the power to investigate troopers. *See* N.C.G.S. §§ 20-196.3; 20-184; 143B-195. It was "[Norman]'s understanding that the SBI could impose penalties on [him] in relation to [his] service as a trooper." Norman Decl. ¶ 13.

Troop D2's Headquarters serves many functions. *Id.* at ¶ 4. There is a garage to service the patrol cars, a gas pump, a body shop, and offices. *Id.* at ¶ 4. Troopers appear there about once a week to file paperwork and pump fuel. *Id.* at ¶ 4. Otherwise, troopers have little reason to appear at the headquarters. *Id.* at ¶ 4.

**B.  Federal agents use aerial drone surveillance technology, concealed recording devices, and a confidential informant to record Norman selling guns from his collection.**

In the spring of 2021, the Raleigh Police Department was using an informant as part of an unrelated drug investigation. D.E. 10, ¶ 4 (affidavit in support of criminal complaint). The informant told law enforcement that a man named Tommy Lee Hudson had bought guns from a Highway Patrol trooper. *Id.* at ¶ 5. So the Raleigh Police, the FBI, and the ATF opened an investigation into that trooper. *Id.* at ¶ 4.

6

Using aerial drone surveillance technology, concealed recording devices, and a confidential informant, the FBI surveilled Norman engaging in firearms transactions over the course of two months.  *See id.*, *passim*.

Federal agents filed a sealed criminal complaint charging Norman with one count of knowingly selling a firearm to a felon, in violation of 18 U.S.C. § 922.  D.E. 1, 10.  After this court issued a sealed arrest warrant, the FBI, the ATF, the SBI, and First Sergeant Catherwood organized a plan to corner Norman and interrogate him.

### C. First Sergeant Catherwood orders Norman to appear at headquarters.

Six days after this Court issued the arrest warrant, and during the early morning hours of July 7, 2021, Norman prepared for duty and had put on his uniform and duty belt.  Norman Decl. ¶ 8.  He checked his service weapon to ensure it was in working condition and headed to his Highway Patrol car parked in his driveway.  *Id.*  As Norman's cell phone buzzed, he saw First Sergeant Catherwood, whom Norman rarely interacted with, was calling him.  *Id.*  First Sergeant Catherwood ordered Norman to appear at the headquarters at once.  *Id.*

He asked Norman "how long will it take you to get here?" and Norman responded that it would take him twenty minutes.  *Id.* at ¶ 8.  Complying with this order, Norman drove to the headquarters immediately.  *Id.* at ¶ 9.  Norman knows that when the First Sergeant orders a trooper to appear at headquarters, he should not make stops or respond to radio calls but should drive directly to the headquarters.  *Id.* at ¶ 8.

7

Norman arrived, parked his car in a parking spot in front of First Sergeant Catherwood's office, entered the building, and walked into the office. *Id.* at ¶ 9. The First Sergeant asked Norman which roads he took to get there. *Id.* at ¶ 9.

### D.    Federal and state agents arrive to interrogate and arrest Norman.

The First Sergeant ordered Norman to hand over his firearm and his taser. *Id.* at ¶ 10. Uncertain as to why, but intent on complying with these orders, Norman obeyed. *Id.* The First Sergeant ordered Norman to wait inside his office for further instructions. *Id.* Norman heard and then saw through the First Sergeant's office window a black Chevy Tahoe roar up and stop in front of Norman's patrol car, blocking it in place. *Id.* at ¶ 11. Another officer ran up to First Sergeant Catherwood and grabbed Norman's firearm and taser. *Id.* Norman stepped into the hallway to get a better look at what was happening. *Id.*

### E.    State and federal agents enter the headquarters and shuffle Norman into the First Sergeant's office for an interview.

Seconds after the SUV roared up, two men wearing gun, belt, and badge entered the building, approached Norman, and told him that one of them was a special agent with the ATF and that one of them was an agent with the SBI. *Id.* at ¶ 12. This was the first time Norman had ever interacted professionally with federal or SBI agents. *Id.*

8

The two men were ATF Special Agent Michael Newsome and SBI Assistant Special Agent in Charge W. Marsh. Exhibit A at 00:05.[1]

Both agents motioned Norman to get out of the hallway and step back into First Sergeant Catherwood's office. Norman Decl. at ¶ 12. Still confused and believing he had no choice, Norman acquiesced and allowed himself to be led back into First Sergeant Catherwood's office. *Id.*

The agents interrogated Norman for an hour in the First Sergeant's office. Exhibit A. They did not advise him of his rights under *Miranda* or *Garrity.* Only seconds after SBI Agent Marsh stated to Norman that the interview was "voluntary," Exhibit A at 02:55-03:03, ATF Agent Newsome told Norman that lying to a federal agent is a five-year federal felony. Exhibit A at 03:48-57.

### F. Norman passes out, wakes up in handcuffs, and signs away his badge after an ambulance shows up to take him to the hospital.

After the interview, Norman passed out on the carpet. Norman Decl. ¶ 14. When he awoke, the agents were holding him up under the armpits to try to resuscitate and cuff him. *Id.* An ambulance pulled up to the headquarters to transport Norman to the hospital. *Id.* After medics performed cardiovascular diagnostics and vital sign tests in the First Sergeant's office, they asked Norman if he wanted to go to the hospital. *Id.* Norman said no. *Id.*

---

[1] Exhibit A is a video recording of Norman's interrogation that the defense has provided to the Court on a USB drive in compliance with MDNC electronic filing directions.

While the medics were packing up, a captain and a lieutenant with the Highway Patrol's Internal Affairs entered the First Sergeant's office. The captain handed Norman a resignation form and gave him two options. *Id.* at ¶ 15. Either Norman could stay on the force, be reduced to administrative leave, and be the subject of continued internal investigation, or he could relinquish his badge on the spot. *Id.* Norman resigned by scribbling his name on the signature block and left the headquarters in handcuffs sitting in the backseat of the black Chevy Tahoe. *Id.*

Today, Norman is charged in a three-count indictment with two counts of knowingly selling a firearm to a felon and one count of engaging in the business of selling firearms without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a), 924(a)(1)(D), 922(d), 924(a)(2).

## ARGUMENT

Norman was in custody for purposes of *Miranda* because no reasonable person in his situation would have felt free to leave or terminate the encounter. His statements must be suppressed under *Miranda* because Norman made them to law enforcement while he was in custody and subject to express questioning without having been advised of his rights. But even if one would have felt free to leave, a reasonable person would have believed that it would have been on penalty of job loss or significant sanction. The Supreme Court's decision in *Garrity v. New Jersey*, 385 U.S. 493 (1967), prohibits the Government from using statements obtained in this way against Norman at trial.

Case 1:21-cr-00373-UA   Document 31   Filed 01/24/22   Page 10 of 26

I. **This Court must suppress Norman's statements under *Garrity v. New Jersey* because the trifecta of Trooper-SBI-ATF authority created a penalty situation when they levied the implied threat that Norman's failure to participate in the interview would result in a substantial penalty.**

This Court must suppress Norman's statements under *Garrity v. New Jersey* because the agents and the First Sergeant created a penalty situation when they levied the implied threat that Norman's failure to participate in the interview would result in a substantial penalty.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The privilege applies equally to employees of the government, who "are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967).

In *Garrity*, the court held that the privilege prohibits the government from using threats of termination against a police officer as a means of securing the officer's cooperation in an investigation. 385 U.S. at 499. If the government makes the threat and the officer speaks, then the statements are considered coerced and are inadmissible in criminal proceedings against the officer because "[t]he option to lose [one's] means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." *Id.* at 497.

*Garrity* protection extends beyond threats of outright discharge. *Garrity* and its progeny prohibit the government from threatening a broad range of sanctions to extract statements from a government employee. *E.g.*, *Garrity*, 385 U.S. at 497 (job forfeiture);

11

*Spevack v. Klein*, 385 U.S. 511, 516 (1967) (stripping of law license); *Lefkowitz v. Cunningham*, 431 U.S. 801 (1977) (loss of elected position); *Lefkowitz v. Turley*, 414 U.S. 70 (1973) (cancellation of government contracts). But "direct economic sanctions and imprisonment are not the only penalties capable of forcing the self-incrimination which the Amendment forbids." *Cunningham*, 431 U.S. at 806. A threat to "inflict potent sanctions" or "substantial penalties" against the suspect unless he speaks produces coerced statements that are inadmissible under the Fifth Amendment. *Id.* at 805.

The *Garrity* rule applies when the government creates a penalty situation by making some sort of threat. *See Minnesota v. Murphy*, 465 U.S. 420, 435 (1984). A penalty situation is created if there is a "reasonable basis for concluding that [the government] attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." *Id.* at 437. A penalty situation can be communicated either "expressly or by implication." *Id.*

The Fourth Circuit has not yet adopted a rule for deciding how *Garrity* protection operates in the context of implied threats. The majority approach, however, is twofold: first, whether the officer subjectively believed that if he did not participate in questioning, he would suffer a sanction; and, second, whether that belief was objectively reasonable. *See United States v. Vangates*, 287 F.3d 1315, 1321-22 (11th Cir. 2002); *United States v. Friedrick*, 842 F.2d 382, 395 (D.C. Cir. 1988).

Courts examine the totality of the circumstances when conducting this two-prong inquiry. *Vangates*, 287 F.3d at 1321-22; *Friedrick*, 842 F.2d at 395. And the burden

is on the defendant to persuade the court that both prongs are satisfied.  *See Vangates*, 287 F.3d at 1322; *United States v. Cook*, 526 F. Supp. 2d 1, 7 (D.D.C. 2007), *aff'd*, 330 F. App'x 1, 1 (D.C. Cir. 2009) (unpublished).[2]

A telltale sign of a penalty situation involves direct orders for the suspect to appear at the location of questioning.  *E.g.*, *Friedrick*, 842 F.2d at 396 (reasoning that "[w]e think it beyond reasonable dispute that when Friedrick initially appeared [at the interview], he was acting under compulsion.  After all, Friedrick had been *ordered* by his FBI superiors to appear[.]" (emphasis in original)).  Another factor, borrowed from the *Miranda* context, is whether the investigators told the officer that he was free to leave or terminate the questioning at any time.  *United States v. Trevino*, 215 F. App'x 319, 322 (5th Cir. 2007) (unpublished) (finding belief of sanction not reasonable because the officer was told before questioning began that he was free to leave the interrogation room at any time).

Whether interrogators confiscate a police officer's service weapon is relevant to whether the officer reasonably believed he would suffer a sanction if he did not participate in questioning.  *See United States v. French*, 216 F. Supp. 3d 771, 776 (W.D. Tex. 2016) (finding belief of job loss not objectively reasonable because the officer

---

[2] At least one Circuit has held that *Garrity* only applies when there is an express threat and a state statute authorizing the police officer's discharge if he fails to speak.  *See United States v. Indorato*, 628 F.2d 711, 716 (1st Cir. 1980).  But *Indorato* predates the Supreme Court's decision in *Murphy* in 1984, in which the court held that a classic penalty situation for Fifth Amendment purposes can arise either "expressly *or by implication*." *Murphy*, 465 U.S. at 435 (emphasis added).

13

"maintained possession of his firearm, baton, and pepper spray throughout the interview[.]"), *aff'd*, 708 F. App'x 205 (5th Cir. 2018) (unpublished).

But no single fact is dispositive in a totality of the circumstances inquiry. *United States v. Giddins*, 858 F.3d 870, 885 (4th Cir. 2017). The focus is whether government agents, through their words and actions, instilled in the police officer a reasonable belief that he would lose his job or suffer a substantial penalty if he did not waive his right to remain silent. *See Cunningham*, 431 U.S. at 805; *Vangates*, 287 F.3d at 1321-22.

Here, the First Sergeant, the ATF agent, and the SBI agent created a penalty situation when they confronted Norman at headquarters. A superior officer whom Norman rarely interacted with, First Sergeant Catherwood, ordered Norman to appear at the headquarters at once. Norman Decl. ¶¶ 6-7, 9. The show of authority continued when the First Sergeant pressed Norman on the route that he took to get there. Norman Decl. ¶ 9. Amplifying Norman's reasonable fear that he was in some sort of trouble was the confiscation of his duty weapon and his taser. *Cf. French*, 216 F. Supp. 3d at 776. The agents doubled down on their plan by aggressively pulling up in a black SUV, blocking Norman's patrol car in place.

The men behind the plan were all armed with superior authority over Norman. As far as Norman—or any other reasonable trooper—was concerned, First Sergeant Catherwood had the power and authority to fire, demote, and suspend him. And SBI Agent Marsh had plenary authority to investigate Norman, as the SBI has supervisory authority over troopers. *See* N.C.G.S. §§ 20-196.3; 20-184; 143B-195. Norman, of

14

course, did not need a legal handbook to tell him that, as it was "[his] understanding that the SBI could impose penalties on [him] in relation to [his] service as a trooper." Norman Decl. ¶ 13. Completing the trifecta of intimidation was ATF Agent Newsome, whose presence converted the encounter into an uncounseled, unwarned perjury minefield when the agent informed Norman that lying to a federal agent is a felony. Exhibit A at 03:48-57.

By the time the recording began, Norman was stripped of the tools he needed to continue his shift and the means he needed to leave the premises. Admittedly, SBI Agent Marsh told Norman that the interview was "voluntary." Exhibit A at 02:55-03:03. But it is unthinkable for a reasonable officer in this situation to believe he could simply have terminated the interview and walked away. The only option for Norman, who was wearing his trooper uniform, would have been to walk out of the headquarters and find his own way home. It is questionable, however, whether even *that* was a realistic exit because First Sergeant Catherwood had ordered Norman to appear at the headquarters, *see Friedrick*, 842 F.2d at 396, and the encounter took place in the First Sergeant's office.

The totality of the circumstances—the order, the blockade, the trifecta of authority, the confiscation of service weapon and taser—instilled in Norman a reasonable belief that if he did not participate, he would lose his job or suffer a substantial penalty. *Garrity* prohibits the government from using statements obtained in this way in this criminal prosecution. The statements must be suppressed.

15

**II.** **This Court must suppress Norman's non-*Mirandized* statements because having one's car blocked in and his weapons confiscated by a trifecta of higher-ranking authority are hallmarks of custody.**

Courts must suppress custodial statements made to law enforcement unless the suspect knowingly waived his *Miranda* rights. *Giddins*, 858 F.3d at 879. A person must both be in custody and subject to interrogation for *Miranda*'s safeguards to apply. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). A suspect is in custody for purposes of *Miranda* when his freedom of action is curtailed to a degree comparable to formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983). An objective inquiry, the question is whether a reasonable person would have felt free to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).[3]

Because it calls for an objective inquiry, "the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *J.D.P. v. North Carolina*, 564 U.S. 261, 271 (2011) (internal quotation marks omitted). Courts examine the totality of the circumstances in making a custody determination. *Giddins*, 858 F.3d at 879. No single factor is dispositive. *United States v. Colonna*, 511 F.3d 431, 436-37 (4th Cir. 2007).

Norman's status as a police officer does not change these parameters. The safeguards setup by *Miranda* "are afforded to every individual and do not depend on

---

[3] Courts differ on which party bears the burden of establishing that a custodial interrogation did or did not take place. *See United States v. Artis*, 2010 WL 3767723 at *4, *4 n.2 (D. Vt. Sept. 16, 2010) (unpublished) (collecting cases). Either way, the defense embraces the burden here.

16

determinations of the individual's awareness of his Fifth Amendment rights." *Desire v. Atty General of California*, 969 F.2d 802, 805 (9th Cir. 1992) (holding that "it is irrelevant that [the suspect] was a deputy sheriff."); *United States v. Longbehn*, 850 F.2d 450, 453 (8th Cir. 1988) (rejecting argument that suspect's status as a police officer obviated the need for *Miranda* warnings); *United States v. Farinacci-Garcia*, 551 F. Supp. 465, 476 (D.P.R. 1982) (rejecting argument that *Miranda* warnings were not required because suspect was an attorney). Because Fifth Amendment protections are the same for civilians and police officers, courts should treat police officers as if they were "laymen." *See United States v. Street*, 472 F.3d 1298, 1311 (11th Cir. 2006).

There is no hard limit on the surrounding circumstances a court may consider in the custody analysis. In the Fourth Circuit, relevant factors often include, but are not limited to, the

> time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.

*United States v. Hashime*, 734 F.3d 278, 283 (4th Cir. 2013) (citation omitted).

A classic custody factor is whether law enforcement blocked the suspect's means of exit. This one is perhaps the most revealing because it goes to the heart of the standard: whether a reasonable person would have felt free to leave. Restricting a suspect's ability to return to or access his vehicle, or his ability to drive away, is a hallmark of custody. *See, e.g., Giddins*, 858 F.3d at 880 (finding suspect in custody

because police told him he needed to waive *Miranda* rights to get his car back); *Longbehn*, 850 F.2d at 453 (finding suspect (a police officer) in custody because law enforcement ordered him to hand over his firearms and prevented him from accessing his car); *United States v. Jones*, 846 F.2d 358, 361 (6th Cir. 1988) (finding suspect in custody because blocking his car deprived him of his freedom of action).

Disarming a suspect is another hallmark of custody. *See Longbehn*, 850 F.2d at 453 (finding suspect (a police officer) in custody because law enforcement ordered him to hand over his firearms); *United States v. Archuleta*, 981 F. Supp. 2d 1080, 1092 (D. Utah 2013) (finding suspect in custody because "[t]he confiscation of his gun was a clear signal that he was not free to leave[.]"), *aff'd*, 619 F. App'x 683 (10th Cir. 2015) (unpublished); *Nova v. Bartlett*, 63 F. Supp. 2d 449, 454 (S.D.N.Y. 1999) (stating in dicta that pat down and confiscation of knife sufficient on its own to convey impression that suspect was not free to leave), *aff'd on other grounds*, 211 F.3d 705 (2d Cir. 2000). Voluntarily checking one's weapons in a routine matter, however, does not cut in favor of custody. *See United States v. Uzenski*, 434 F.3d 690, 705 (4th Cir. 2006) (finding no custody where suspect (a police officer) voluntarily checked his weapons at front desk of SBI office).

Another factor is whether law enforcement told the suspect he was either "not under arrest" or was "free to leave." Although no single factor is dispositive, this one often "sway[s] the analysis", *Colonna*, 511 F.3d at 436-37, because it goes to the heart of what a reasonable person hearing those words—"you're free to leave"—would have

Case 1:21-cr-00373-UA   Document 31   Filed 01/24/22   Page 18 of 26

thought, *see, e.g.*, *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) (finding no custody because suspect told she was not under arrest); *Uzenski*, 434 F.3d at 704 (finding no custody because suspect told he was free to leave); *United States v. Hargrove*, 625 F.3d 170, 179 (4th Cir. 2010) (finding no custody because suspect told he was free to leave and that he was not under arrest).

Courts are less likely to find the suspect in custody when the suspect initiated the encounter. *Compare United States v. Howard*, 115 F.3d 1151, 1155 (4th Cir. 1997) (finding no custody because suspect voluntarily accompanied DEA agents from airport to police station), *and Uzenski*, 434 F.3d at 705 (finding no custody where suspect (a police officer) voluntarily met SBI agents at their office in response to interview request), *with Colonna*, 511 F.3d at 435-36 (finding suspect in custody where agents came to her home).

Relatedly, courts consider the location of the encounter. An interview in the familiar surroundings of one's home is less likely to trigger the pressures of a custodial setting whereas a location riddled with authority like a police station would. *See, e.g.*, *Hargrove*, 625 F.3d at 180-81 (finding no custody when suspect interviewed in his own home); *United States v. Day*, 591 F.3d 679, 697 (4th Cir. 2002) (finding no custody because suspect was standing outside his car in a public place rather than at the police station).

Here, Norman's freedom of action was limited to a degree associated with formal arrest when the trifecta of Trooper-SBI-ATF authority blocked in Norman's patrol car,

confiscated his duty weapon and his taser, and approached him from the only available exit.

Blocking in a suspect's means of exit and disarming him are hallmarks of custody. *See Giddins*, 858 F.3d at 880; *Longbehn*, 850 F.2d at 453. The facts in *Longbehn* highlight the pressures associated with blockades and confiscations. There, as here, a police officer was being investigated. While he was at the shooting range, law enforcement approached the officer and ordered him to remove his weapon and his duty belt. *Longbehn*, 850 F.2d at 452. Once law enforcement succeeded in disarming the officer, they did not allow him to drive his car to the station. *Id.* The court found the officer was in custody for purposes of *Miranda*. *Id.* at 453.

Law enforcement did almost the same thing here. After First Sergeant Catherwood ordered Norman to relinquish his gun and his taser, Norman was not merely "not allowed to drive his own vehicle," *Longbehn*, 850 F.2d at 451, but the agents roared up in an SUV, blocking his patrol car. So while the suspect in *Longbehn* was merely prevented from accessing his car, and while the suspect in *Giddins* was merely unable to get his car back, the agents in the present case dramatically set up a blockade right in front of Norman by pulling up in a black SUV, driving it onto the grass to block his patrol car. And it is not only *what* law enforcement does, but *how* they do it, that informs how a reasonable person would have reacted. *United States v. Azua-Rinconada*, 914 F.3d 319, 326 (4th Cir. 2019); *Giddins*, 858 F.3d at 879; *Hashime*, 734 F.3d at 283.

Compounding the reasonable belief that he was in custody because of the blockade was the fact that the agents disarmed him. Another hallmark of custody. *See, e.g.*, *Longbehn*, 850 F.2d at 453. Unlike in *Uzenski*, this was not a request for Norman to "check his weapon" at the front desk. It was an order to turn over his weapons.

The men orchestrating the entire plan were not colleagues of equal rank. Any reasonable trooper in Norman's situation would have recognized that each of these men enjoyed a higher rank, in one way or another, over Norman. First Sergeant Catherwood wielded the power to terminate and discipline Norman; SBI Agent Marsh had the power to investigate Norman and impose penalties; and ATF Agent Newsome's mere presence had the power to compel truthful answers from Norman under penalty of perjury, *see* 18 U.S.C. § 1001. Even if a reasonable officer in this situation would have felt that walking out was an option, which he would not, it would have been met with a substantial penalty. *See* Point I, *supra*. At bottom, any reasonable person in this situation would have thought and felt that leaving the confines of the headquarters was not a realistic option.

Relatedly, this show of authority took place in First Sergeant Catherwood's office. *Cf. Hargrove*, 625 F.3d at 179 (no custody because suspect was in familiar surroundings of his own home). At the risk of sounding in hyperbole, it may have been professional suicide for Norman to have simply walked out of the office and left after having been ordered to appear by the First Sergeant himself.

Nor was this a voluntary encounter, as in *Howard* or *Uzenski*, because First Sergeant Catherwood ordered Norman to appear at once. Instead, this was a confrontation organized and carried out by Norman's superiors. That the agents told Norman his participation was "voluntary" is not dispositive. *Hashime*, 734 F.3d at 284. Even if a reasonable person would have believed the agents when they told him that his participation was voluntary, the agents never told Norman that he was free to leave or that he was not under arrest. *Cf. Parker*, 262 F.3d at 419; *Uzenski*, 434 F.3d at 704; *Hargrove*, 625 F.3d at 179.

Norman reasonably believed that the blockade cut off his means of leaving and that the disarming suggested he was under the full control of the agents. It would have been unreasonable for him to think he could reject the agents' request and walk out. But even if he could have walked out, that begs the question of what would have happened next. As explained above, he probably would have been fired, suspended, or both. *See* Point I, *supra*.

The totality of the circumstances establish that a reasonable person in Norman's situation would not have felt free to leave. This Court should suppress Norman's statements under *Miranda* because he was in custody and subject to express questioning.

## REQUEST FOR A HEARING

Norman requests that the Court hold an evidentiary hearing to aid the Court in the resolution of the factual issues raised by this motion. A hearing is not always required in deciding a motion to suppress. *United States v. Griffin*, 811 F. App'x 815, 816 (4th Cir. 2020) (unpublished). But when material facts are in conflict, the court may elect to hold an evidentiary hearing to assist in the process of making findings of fact and conclusions of law. *United States v. Taylor*, 13 F.3d 786, 789 (4th Cir. 1994).

*     *     *

## CONCLUSION

State and federal law enforcement conducted a long, covert investigation into Defendant Norman, secured an arrest warrant, arranged for his superior to direct his appearance, and conducted a surprise interview without required warnings. No reasonable person in his situation would have felt free to leave or terminate the encounter. Even if one would have felt free to leave, it would have been on penalty of job loss or significant sanction. He has a constitutional right to have his statements removed from the jury's consideration.

Norman requests that this Court issue an order suppressing the statements he made to law enforcement on July 7, 2021, and for such other and further relief as this Court may deem just and proper.

Respectfully submitted, this the 24th day of January, 2022.

Respectfully submitted,

/s/Joshua Howard
NC Bar No. 26902
Gammon, Howard & Zeszotarski, PLLC
115 ½ West Morgan Street
Raleigh, NC 27601
(919) 521-5878
Fax: (919) 882-1898
jhoward@ghz-law.com
Counsel for Defendant Norman

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2022, I served a copy of the foregoing through

the electronic service function of the Court's electronic filing system on counsel for the

United States.

Joanna G. McFadden
United States Attorney's Office – MDNC
101 S. Edgeworth St., 4th Floor
336-332-6362
Fax: 336-333-5381
Joanna.mcfadden@usdoj.gov


Respectfully submitted, this the 24th day of January, 2022.




/s/ Joshua B. Howard
Counsel for Defendant
Retained

# **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.3(d), this brief has been prepared using Garamond, 14 point typeface. I certify that the brief contains 5885 words.


/s/ Joshua B. Howard
Counsel for Defendant
