UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
NO. 1:21-CR-373

---

UNITED STATES OF AMERICA,

v.

TIMOTHY JAY NORMAN

---

## DECLARATION OF TIMOTHY NORMAN
## IN SUPPORT OF HIS MOTION TO SUPPRESS STATEMENTS

Pursuant to 28 U.S.C. § 1746, I, Timothy Jay Norman, hereby declare as follows:

1. I am the Defendant in the above-captioned action and make this declaration in support of my motion to suppress statements I made on July 7, 2021 pursuant to the Fifth Amendment to the United States Constitution.

2. I have been a firearms enthusiast, hobbyist, collector, and hunter since my youth. I have collected special edition and rare items including hunting rifles and revolvers, knives, rifle bags, optics, and taxidermic animals.

3. From 2012 to July 7, 2021, I was a sworn law enforcement officer under North Carolina law, serving as a North Carolina State Highway Patrol Trooper (the "Highway Patrol"). I was based out of Guilford County-D2, meaning Troop D, Station 2. During my time on the Highway Patrol, my duties as a Trooper included supervising

1

the roadways, conducting vehicle stops, and making arrests for driving while intoxicated.

4. Troop D's headquarters is in Guilford County, North Carolina. The ranking officer for Troop D-2 is a first sergeant. The first sergeant oversees nearly thirty troopers and sergeants in an area that embraces Guilford County, Rockingham County, Randolph County, Caswell County, Person County, Orange County, Alamance County, Chatham County, and Lee County. Troop D2's Headquarters serves many functions. There is a garage to service the patrol cars, a gas pump, a body shop, and offices. Troopers appear there about once a week to file paperwork and pump fuel. Otherwise, troopers have little reason to appear at the headquarters.

5. During my time as a state trooper, I was the subject of zero complaints, I faced no disciplinary action, and was never the subject of an excessive force or similar lawsuit. I routinely received letters of support and letters from civilians thanking me for the way I handled interactions on the roadways and in the community.

6. At all relevant times, my direct superior was First Sergeant Grady R. Catherwood. It is my understanding that First Sergeant Catherwood had the power and authority to terminate my employment with the Highway Patrol, as well as the power to impose job-related sanctions like suspension, alternations of work assignments, and more. First Sergeant Catherwood could impose "desk duty." Desk duty means a trooper spends an indefinite period working strictly from the office. The trooper's service weapon, badge, taser, and patrol car are all confiscated during this

period and the trooper cannot wear his uniform to work. I have seen this happen to other troopers. Desk duty is often a preliminary measure taken before a trooper is investigated and terminated from employment.

7. At all relevant times, I was required to answer directly to, and follow the orders of, First Sergeant Catherwood. I had rarely interacted with the First Sergeant.

8. During the early morning hours of July 7, 2021, I was preparing for duty and had put on my uniform and duty belt, checked my service weapon to ensure it was in working condition, and headed to my Highway Patrol vehicle which I would routinely drive home from duty. At this time, First Sergeant Catherwood called me on my cell phone and ordered me to appear at the station to review a vehicle crash report. He asked me "how long will it take you to get here?" I responded that it would take me about twenty minutes. When the First Sergeant orders a trooper to appear at the headquarters, the trooper is not supposed to make stops of other drivers or respond to radio calls.

9. I drove directly to the headquarters, parked my car in a parking spot directly in front of First Sergeant Catherwood's office, and proceeded to enter the building and walk into the First Sergeant's office. He asked me which roads I took to get there. Because his window shades were open, my patrol car was visible through the window.

10. Within a matter of seconds, First Sergeant Catherwood ordered me to hand over my duty weapon and my taser. I was confused as to why this was happening,

3

but I obliged and relinquished my firearm and taser to First Sergeant Catherwood. He took them, said he would be right back, told me to wait in his office, and left the room.

11. I then heard a vehicle drive up quicky in the parking lot and, through the office window, I saw it stop short in front of my patrol car, blocking it in place. The vehicle that drove up was a large, black SUV. I then saw First Sergeant Catherwood appear in view through the window. Another officer ran across the window and approached First Sergeant Catherwood, at which point the First Sergeant handed my duty weapon and taser to the other officer. I stepped into the hallway by the First Sergeant's office to see what was happening.

12. Two men then approached me through the front door of the building and asked if they could speak with me regarding an investigation as they motioned for me to get back into the First Sergeant's office. When I expressed confusion as to what was transpiring, and as to what the subject matter was, one of them informed me that he was an agent with the ATF, and that one was with the North Carolina State Bureau of Investigation ("SBI"). They told me that I was not in trouble, that the situation was inconsequential, that it would not take long, and that it related to other individuals. This was the first time I had ever interacted professionally with federal or SBI agents.

13. The ATF and SBI agents interviewed me for over an hour. It was my understanding that the SBI could impose penalties on me in relation to my service as a trooper. At no point before or during the interview did the ATF or SBI agent inform me of my rights under the Fifth Amendment, *Miranda v. Arizona*, or *Garrity v. New Jersey*.

14. At the end of the interview, I passed out and blacked out. When I woke up, the agents were holding me up under the armpits to try to resuscitate me and place me in handcuffs. An ambulance pulled up to the headquarters to transport me to the hospital. After paramedics performed their tests in the First Sergeant's office, they asked me if he wanted to go to the hospital and I declined.

15. While the medics were packing up, a captain and a lieutenant with the Highway Patrol's Internal Affairs entered the First Sergeant's office. The captain handed me a resignation form and gave me two options. Either I could stay on the force, be put on administrative leave, and be the subject of continued internal investigation, or I could resign. I resigned by signing the resignation form and left the headquarters in handcuffs sitting in the backseat of the black Chevy Tahoe.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: January 24, 2022
Guilford County, North Carolina

*Timothy Jay Norman*
TIMOTHY JAY NORMAN

# G.S. § 10B-43 NOTARIAL CERTIFICATE FOR AN OATH OR AFFIRMATION

Guilford County, North Carolina

Signed and sworn to before me this day by Timothy Norman.
*Name of principal*

Date: 01/24/2022

(Official Seal)



*Official Signature of Notary*

J. Grace Shannon, Notary Public
*Notary's printed or typed name*

My commission expires: 8-8-2026

---

**OPTIONAL**

This certificate is attached to a Declaration in Support, signed by Timothy Norman
*Title/Type of Document*  *Name of Principal Signer(s)*

on 01-24-2022, and includes 5 pages.
*Date*  *# of pages*

