IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 1:21CR373-1 |
| | : | |
| TIMOTHY JAY NORMAN | : | |

## GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

NOW COMES the United States of America by and through Sandra J. Hairston, United States Attorney for the Middle District of North Carolina, and files this response to the defendant's motion to suppress statements. As set forth in detail below, Norman's motion establishes no Constitutional violations. To the contrary, and consistent with the evidence, his interview was not custodial and his statements were similarly voluntary. Accordingly, this Court should deny his motion in its entirety.

I.      STATEMENT OF FACTS

A. *Timothy Norman sells multiple firearms to a known convicted felon and a person he barely knows, each time at a significant markup.*

Norman's conduct is detailed extensively in the affidavit supporting the criminal complaint that United States Magistrate Judge Auld issued on July 7, 2021, charging Norman with transfer of firearms to a prohibited person, in violation of 18 U.S.C. § 922(d). *See* 1:21MJ236-1, Docket Entry No. 1. In sum,

Norman, a sworn law enforcement officer, kept a ready arsenal of firearms for sale. He sold multiple firearms to a friend, Tommy Lee Hudson,[1] whom he had known for a decade and knew had recently gone to prison for stabbing someone. He also solicited Hudson to act as a broker in selling firearms to others. One of these buyers happened to be a Confidential Human Source (CHS) working with the Federal Bureau of Investigation. Norman knew this CHS only by a (false) first name. He sold two firearms to the CHS the first time he met him, one of which was an assault-style rifle with an extended magazine. The second time he met up with the CHS, he sold him a handgun on the side of the road out of the trunk of his patrol vehicle at an abandoned gas station. Each time, Norman sold the firearms at a significant markup.[2]

---

[1] These sales give rise to Counts Two and Three of the indictment.

[2] On May 12, 2021, Norman sold Hudson a used decommissioned North Carolina State Highway Patrol (NCSHP) Sig Sauer P226 handgun for $1,600; records from the federal firearms licensee where he purchased it indicated he paid $410 for it.

On June 8, 2021, Norman sold the CHS a Beretta 12-gauge shotgun, an Arma Lite AR-15 semi-automatic rifle, one magazine, one soft black case, and one drum magazine for a total of $3,200. Records for the federal firearms licensee where he purchased the firearms indicated that he paid $350 for the Beretta 12-gauge shotgun and $800 for the Arma Lite AR-15 semi-automatic rifle, for a total of $1,150 for the firearms.

On June 24, 2021, Norman sold the CHS a new decommissioned NCSHP Sig Sauer P226 handgun for $2,000; records from the federal firearms licensee where he purchased it indicated he paid $410 for it.

Norman advised agents in his interview that he made "about $1,000" off of both the May 12 and June 24 sales to the CHS. In actuality, he profited $2,780 from the May

2

And each time Norman sold to the CHS, he tried to upsell him another item: on June 8, it was a device that would make his rifle automatic and on June 24, it was additional ammunition. As Norman told Hudson prior to one of the deals: "I just want to make something on it, if I buy them and put them in my name." *See id*. at ¶ 16. To that end, when SBI agents searched Norman's patrol car after his federal arrest, they found an envelope with thousands of dollars of cash in it, including the FBI controlled buy money the CHS paid Norman for the firearms during the investigation. And when they searched Norman's home, they found his inventory of sixty firearms and thousands of rounds of ammunition.

B. *Sgt. Catherwood, Norman's friend and immediate supervisor, who does not have the power to transfer or fire any NCSHP personnel and whom Norman sees on a regular basis, asks Norman to come to the district substation on a day Norman is already on duty.*

Magistrate Judge Auld issued a criminal complaint and related arrest warrant for Norman based on the facts summarized in Section A *supra*. However, because of Norman's demonstrated disregard for firearms' laws (and public safety, insofar that he was selling them to a convicted felon he knew had stabbed someone) and the fact that Norman was likely to be armed wherever

---

12 and June 24 buys combined, and the difference between what Norman paid for the two firearms sold in the June 8 controlled buy and what he charged for those firearms with a case and magazine was $2,050.

3

encountered, agents needed to approach him when he was disarmed. Accordingly, a captain with North Carolina State Highway (NCSHP) Patrol Internal Affairs (IA) instructed Norman's immediate supervisor, First Sergeant Grady Catherwood, to call Norman over to his district substation in the morning to review an accident report Norman had prepared, request his firearm and taser for an inventory check, and turn those items over to the IA captain.

By way of background, and as he will testify at the hearing, Sgt. Catherwood leads Troop D2, one of eight subsections of Troop D. Troop D2 covers only Guilford County. Troopers in D2 are welcome at its substation, which is a small building with one main room, two offices, a kitchen, and no hallway. The troopers have mailboxes and filings cabinets there, many stop by on a regular basis, and Norman himself stopped by there multiple times a week. It is not NCSHP "headquarters"; that facility is in Raleigh. Below is an exterior photograph of the D2 substation; part of the facility is occupied by the North Carolina Department of Motor Vehicles:

4



While Sgt. Catherwood does lead Troop D2, he does not have the power to fire or transfer any NCSHP personnel. He does not have the power to place any troopers on "desk duty," either.[3] Further, Sgt. Catherwood has known Norman for approximately a decade through their shared employment by NCSHP. When Sgt. Catherwood was promoted to the supervisor over Troop D2

---

[3] The disciplinary policies relevant to those procedures and operative on July 7, 2021 are attached hereto as Exhibit 1. The United States has filed an unopposed motion seeking production of Norman's personnel file, which the government anticipates will include his acknowledgement of these procedures.

(Norman's troop), Norman was the first person to call him and congratulate him. In fact, the day before Norman was interviewed, he joined Sgt. Catherwood and his secretary for lunch at Ghassan's! Fresh Mediterranean Eats on Battleground Avenue in Greensboro.

On July 7, 2021, Norman was scheduled to be on duty at 6:00 am. At the direction of NCSHP Internal Affairs, Sgt. Catherwood called Norman at approximately 6:40 am.[4] Special Agent (SA) Michael Newsome with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and Assistant Special Agent in Charge (ASAC) William Marsh with the North Carolina State Bureau of Investigation (NCSBI) were present for the phone call but did not speak. Sgt. Catherwood asked if Norman could come to the substation to discuss an accident report that he (Norman) had prepared; Sgt. Catherwood asked Norman if he could come soon because he (Sgt. Catherwood) had somewhere he needed to be but he had to take of this first. Norman replied that it would take him approximately twenty minutes to arrive. Sgt. Catherwood does not recall asking Norman about what route he intended to take or having any further conversation on the phone. SA Newsome and ASAC

---

[4] Though Norman had been scheduled to be on duty for forty minutes, both Sgt. Catherson and ASAC Marsh noted that Norman sounded as though the call had woken him up.

Marsh left the substation and returned to their respective cars, which were parked behind the substation.

At some point thereafter, which Sgt. Catherwood recalled being longer than a twenty-minute interval,[5] Norman arrived. The "roaring"[6] Chevy Tahoe to which Norman refers in his affidavit did not belong to any agents involved in this investigation; it was an NCSHP vehicle and it was already parked there when Norman arrived.

Sgt. Catherwood handed Norman the accident report outside of his secretary's office and asked if he could see Norman's firearm and taser for a serial number check. Norman handed them over without comment; these types of weapons' inventories are conducted bi-annually at NCSHP. He then said, "Man, I'll be right back." Sgt. Catherwood did not order Norman to stay anywhere. Sgt. Catherwood walked out of the substation into the parking lot, where he gave an IA captain Norman's firearm and taser. Sgt. Catherwood did

[5] The phone conversation took place at approximately 6:40 am. Sgt. Catherson interacted with Norman for approximately one to two minutes before he left and federal agents approached him. The recorded interview then begins at 7:16 am, indicating that Norman arrived at the substation shortly before then.

[6] Norman implies that he was intimidated by the roar of an engine, yet he apprehended speeding vehicles for a living and personally owns a Ford F-150 pickup truck and a Dodge Charger SRT Hellcat (with license plate "THURRSTY"), which, with a "797 horsepower and a screaming Supercharged 6.2L HEMI® V8 engine … holds the title of the world's most powerful and fastest mass-produced sedan." *See* Dodge.com, "All Charged Up," https://www.dodge.com/charger/srt.html.

7

not see Norman again that day until after the interview with investigators concluded and Norman needed medical attention. In any event, Sgt. Catherwood did not speak with Norman again after he walked outside the D2 substation.

    C. *SA Newsome and ASAC Marsh interview Norman.*

    After Sgt. Catherwood left the building, SA Newsome and ASAC Marsh entered. Norman was standing outside of Sgt. Catherwood's office, approximately two to three feet into the lobby of the building. Below is a photograph of the interior of the D2 substation from the entrance:



SA Newsome and ASAC Marsh introduced themselves to Norman and showed him their credentials. They told Norman that they were conducting an investigation that they hoped he could help them out with and asked whether he minded participating in a voluntary interview. Norman agreed. ASAC Marsh asked if he could record the interview and Norman agreed. The three then sat down in the main room; Norman sat closest to the door, which was open for the entirety of the interview. ASAC Marsh recorded the interview on

his body worn camera. Below is a screenshot of how each person was seated at the time – Norman is seated closest to the open door:



Approximately three minutes into the recording, ASAC Marsh reiterated that it was a "voluntary interview." SA Newsome then gave Norman the standard Title 18, United States Code, Section 1001 warnings – that is, that if he lies to a federal agent in the course of an investigation, he is subject to criminal prosecution. SA Newsome noted that he gives these warnings to everyone he interviews. Approximately four minutes into the recording, SA Newsome again stated that the interview was "voluntary."

ASAC Marsh and SA Newsome then informed Norman that they identified him from telephone records as an associate of someone they had been

10

investigating. They questioned Norman about his relationship with Tommy Lee Hudson and asked if Norman had ever sold Hudson any firearms. They discussed Norman's sale of firearms generally. At no point in time:

- Did Norman ask if he was a target of this investigation;
- Did Norman ask if he was free to leave;
- Did ASAC Marsh or SA Newsome raise their voices at Norman;
- Did ASAC Marsh or SA Newsome threaten Norman;
- Did ASAC Marsh or SA Newsome brandish firearms at Norman;
- Did ASAC Marsh or SA Newsome lay hands on Norman;
- Did ASAC Marsh or SA Newsome state or even imply that Norman was not free to leave the interview, the room, or the building, at any time; nor
- Did ASAC Marsh or SA Newsome threaten Norman's employment.

In fact, no one from NCSHP was even present. The entire interview lasted approximately one hour and took place in a room with an open door during normal business hours with everyone speaking in cordial tones.

At the end of the interview, SA Newsome presented Norman with the federal warrant and placed him under arrest. Norman then passed out and EMS was called to the substation. He declined to be taken to the hospital and was transported to the custody of the United States Marshal's Service.

11

## II.    DISCUSSION

Norman describes a scenario wherein he, a self-described exemplary employee of the NCSHP, was ordered to appear at a remote, foreboding headquarters he rarely visited by an intimidating supervisor who wielded the power to fire him on the spot. In fact, Norman is a forty-eight-year-old law enforcement officer with a decade of experience who, during a regular shift, was asked by his longtime friend, supervisor, and lunch buddy – who had no power to fire him, bench him, or transfer him – to come to the office where he regularly spent time, to complete a rote and work-related task. Norman was not in custody when interviewed; a reasonable person in Norman's position would have felt free to decline the interview or leave at any time. Nor did anyone direct Norman to speak with the agents who arrived or threaten – either expressly or through implication – that his employment relied upon participation in such an interview.

The Constitution requires that, prior to any custodial interview, law enforcement advise an individual of the safeguards prescribed by *Miranda*. *See Berkemer v. McCarty*, 468 U.S. 420, 429 (1984). However, where a subject is not under formal arrest, there are no *Miranda* requirements unless "under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest." *See United States v. Giddins*, 858 F.3d

12

870, 879 (4th Cir. 2017) (quoting *United States v. Hashime*, 734 F.3d 278, 282

(4th Cir. 2013) and *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001))

(further internal quotation marks and alterations omitted). This is an objective

inquiry, and asks

> whether a reasonable person would have felt he or she was not at
> liberty to terminate the interrogation and leave. This
> determination calls for application of the controlling legal
> standard to the historical facts .... [and thus] presents a mixed
> question of law and fact qualifying for independent review. Facts
> relevant to the custodial inquiry include, but are not limited to, the
> time, place and purpose of the encounter, the words used by the
> officer, the officer's tone of voice and general demeanor, the
> presence of multiple officers, the potential display of a weapon by
> an officer, and whether there was any physical contact between the
> officer and the defendant.

*Id.* at 879-80 (cleaned up).

Related to this inquiry, and as articulated by the Supreme Court in

*Garrity v. New Jersey*, 385 U.S. 493 (1967), the protection "against coerced

statements prohibits use in subsequent criminal proceedings of statements

obtained under threat of removal from office[.]" *See* 385 U.S. at 500. "*Garrity*

held that when a public official must choose between cooperating in an internal

investigation or losing his job, the statements he makes during the

investigation are compelled, and, as such, they cannot later be used against

the official in a criminal trial." *See United States v. Proano*, 912 F.3d 431, 437

(7th Cir. 2019); *see also Sher v. Dep't of Veterans Affairs*, 488 F.3d 489, 501-02

13

(1st Cir. 2007) ("When an employee is confronted with the threat of an adverse employment action for refusal to answer questions, the very act of . . . telling the witness that he would be subject to removal if he refused to answer was held to have conferred such immunity.") (internal quotation marks omitted).

*Garrity* compulsion occurs when a government agency expressly informs an employee that he must answer the agency's questions or lose his job, but case law suggests that it may also exist based upon an indirect threat of termination. "Subtle pressures may be as telling as coarse and vulgar ones." *Garrity*, 385 U.S. at 496 (citations omitted); *see also Minnesota v. Murphy*, 465 U.S. 420, 435 (1984) (holding that when the state "either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, . . . the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution") (emphasis added).

In weighing *Garrity* claims, "[a] number of circuit courts have focused on the 'coercion' issue emphasized by the [Supreme] Court [], making it a claim dependent on such a showing." *See United States v. Trevino*, 215 F. App'x 319, 321 (5th Cir. 2007) (unpublished) (citing *McKinley v. City of Mansfield*, 404 F.3d 418, 436 (6th Cir. 2005); *United States v. Vangates*, 287 F.3d 1315, 1321–22 (11th Cir. 2002); *Chan v. Wodnicki*, 123 F.3d 1005, 1009–10 (7th Cir. 1997); *Singer v. Maine*, 49 F.3d 837, 847 (1st Cir. 1995); *Benjamin v. City of*

14

*Montgomery*, 785 F.2d 959, 961–62 (11th Cir. 1986)). To that end, in *Singer*, the First Circuit held that "coercion is lacking so long as the employee was never threatened or forewarned of any sanction for refusing to testify, even though the employee suffers adverse action after-the-fact as a result of refusing to cooperate." 49 F.3d at 847.

Two circuit courts – the Eleventh and the District of Columbia – apply a two-pronged analysis in examining implied threats, finding that an officer claiming the protection of *Garrity* "must have in fact believed [his] statements to be compelled on threat of loss of job, and this belief must have been objectively reasonable." *See United States v. Friedrick*, 842 F.2d 382, 395 (D.C. Cir. 1988); *see also Vangates*, 287 F.3d at 1321–22. "In the absence of a direct threat, we determine whether the officer's statements were compelled by examining her belief and, more importantly, the objective circumstances surrounding it." *Vangates*, 287 F.3d at 1321–22. The Fourth Circuit has not adopted this particular analysis, but its objective reasonableness prong tracks the general Fifth Amendment analysis that controls in this circuit.

The United States carries the burden of proving that the defendant was not in custody by a preponderance. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the

evidence."). In terms of implied threats prohibited by *Garrity*, *Friedrick* and *Vangates* appear to shift the burden to the defendant to establish both subjective fear of termination and objective reasonableness of that fear.

Here, the facts establish that a) Norman was not in custody; b) Norman was not threatened with loss of employment; and c) whatever self-serving subjective beliefs Norman now espouses, there was no objective reason for him to believe his job was in peril.

A. *Norman was not in custody during his voluntary interview.*

First and foremost, both ASAC Marsh and SA Newsome stressed numerous times from the outset that the interview was "voluntary." While "such a statement 'is not talismanic or sufficient in and of itself to show a lack of custody,'" *see Hashime*, 734 F.3d at 284 (quoting *United States v. Hargrove*, 625 F.3d 170, 180 (4th Cir. 2010)), their behavior and the circumstances of the conversation underscored that: The conversation took place during a normal shift time. Norman sat closest to the door to the room, which was open the entirety of the time. Neither ASAC Marsh nor SA Newsome ever raised their voices at Norman, threatened Norman, brandished a firearm at Norman, or touched Norman. *See, e.g.*, *United States v. Uzenski*, 434 F.3d 690, 704 (4th Cir. 2006) (affirming district court's denial of motion to suppress a detective's pre-*Miranda* statements, noting that during the interview, "the door was left

16

partially open at times, there was no evidence of forceful restraint, … the agents did not assume a threatening tone towards Uzenski; nor did they brandish weapons"). There are simply no indicators that Norman's "freedom of action was curtailed to a degree associated with formal arrest." *See United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017).[7]

The fact that a second NCSHP car was parked behind Norman's work car at the time after he had handed over his weapons for an inventory check

---

[7] To the extent Norman would argue that the existence of the federal arrest warrant – and ASAC Marsh and SA Newsome's knowledge of the same –transformed this voluntary encounter into a custodial interrogation, he would be wrong: the relevant standard is objective and does not analyze "the subjective views harbored by either the interrogating officers or the person being questioned." *J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011). To that end, the Fourth Circuit's decision in *United States v. Giddins* is instructive. There, officers interviewed Giddins with an as-yet-unexecuted state arrest warrant in pocket and then promptly arrested him immediately after the interview concluded. 858 F.3d 870, 878. In reviewing the district court's denial of Giddins' motion to suppress, the Fourth Circuit clearly noted that "[a]lthough an arrest warrant had issued, Giddins was apparently unaware of this fact and, thus, it does not alter the objective inquiry." *See id.* at 880. And, while the Fourth Circuit ultimately did find that officers coerced Giddins' statements in that matter, it was based upon a number of facts completely absent here, not the least of which was those officers' *affirmative* deceit. *See id.* at 883-84. And, despite so finding, the Fourth Circuit reiterated that "'[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns.'" *See id.* at 883 (quoting *Illinois v. Perkins*, 496 U.S. 292, 297 (1990) (with citations omitted)). Here, Norman was called to the D2 substation by First Sgt. Catherwood under circumstances that even the most circumspect and observant officer would consider ordinary and usual. His agency-issued firearm was taken under same inauspicious circumstances. And, it is well-settled that there is "no duty to advise [a defendant] of the identity of the specific offense under investigation." *Giddins*, 858 F.3d at 883 (quoting *Braxton*, 112 F.3d 777, 784 (4th Cir. 1997) (citations omitted)).

17

does not change that determination. Because, yet again, Norman's argument relies on misstatements of fact to buttress his argument regarding "hallmarks" of custody.

There was no "trifecta of Trooper-SBI-ATF authority" blocking in Norman's work vehicle. As Sgt. Catherwood will testify, the "roaring" Chevy Tahoe was an NCSHP car and Norman was not even in a position to see it arrive. Second, North Carolina Department of Motor Vehicle records show that, at the time of this interview, Norman and his wife owned multiple cars.[8] Thus, even if anyone had advised Norman that he was not free to drive his work vehicle away from the substation (which no one did), he was not without a potential mode of transit.

Third, Norman was not "ordered" to surrender the NCSHP weapons issued to him. Sgt. Catherwood asked to see them for a routine inventory check and said, "Man, I'll be right back" after Norman handed them over. Sgt. Catherwood gave no indication that they were being confiscated on any permanent basis or for any reason related to the interview.

These facts stand in stark contrast to the cases where courts have found custodial situations, particularly those Norman cites. In *Giddins*, law

---

[8] *See* Exhibit 2, attached hereto.

enforcement had impounded Giddins' car and expressly told him they would not release it if he did not speak with them. *See* 858 F.3d 870, 883 (4th Cir. 2017). In finding compulsion – in addition to other factors (including the affirmative deceit of officers) – the Fourth Circuit noted that "Giddins relied on his car to get him to his job, and it was the means of maintaining his livelihood." By contrast, a car from Norman's own agency happened to be parked behind his, no one advised him that he could not use that car, and even if they had, he had other personal cars at his disposal.

And, in *United States v. Jones*, an out-of-circuit *per curiam* case from 1988, the defendant, who had not had a single day of formal education and was illiterate, consented to a warrantless search of his apartment "when three police officers, in three separate police cars, lights flashing, surrounded Jones's car, blocking him from leaving the scene." *United States v. Jones*, 846 F.2d 358, 361 (6th Cir. 1988).

Norman's citation of weapons surrender cases is another red herring, and, again, the case law he cites does not support him his claims here. In *United States v. Longbehn* – another out-of-Circuit case from 1988 – where the defendant surrendered his weapons, the distinctions abound:

1) Longbehn was "detained at his place of employment beyond his usual work hours";

2) Longbehn was "compelled to accompany law enforcement officers on what would otherwise be his own time" to a different location;
3) After that, "law enforcement personnel confronted Longbehn and immediately instructed him to remove his privately owned gun and gunbelt and place them in the trunk of a police vehicle where they were secured";
4) "Although Longbehn's vehicle was present at the scene, the police officers precluded him from using it … [and] required Longbehn to be transported under supervision in a police vehicle to police headquarters and then to his residence"; and,
5) "There he was forced to open his home and submit to the execution of its search by five officers, during which he was continuously chaperoned and, despite protestations to the contrary, overtly interrogated by three separate officers."

*United States v. Longbehn*, 850 F.2d 450, 452 (8th Cir. 1988).

On the contrary, the facts here more closely mirror an in-circuit published decision, *United States v. Uzenski*, where the Fourth Circuit affirmed a denial of a former officer's motion to suppress. 434 F.3d 690 (4th Cir. 2006). There, the defendant, then a detective with a local police department, received a call "requesting him to come to the SBI office and check his weapon in his car." *United States v. Uzenski*, 434 F.3d 690, 705 (4th Cir. 2006).[9] Uzenski was suspected – and eventually convicted – of manufacturing

---

[9] Norman characterizes this as Uzenski "voluntarily check[ing] his weapons," *see* Docket Entry 31, at 18, despite the fact that the district court clearly found in that case that Uzenski was requested to come to the SBI office and check his weapon in his car. It is unclear how Norman differentiates the weapons check request in *Uzenski* from the one that occurred here; if anything, the request in *Uzenski* smacks far more of a directive than Sgt. Catherwood's request that Norman come to his own office (not that of the SBI) and give over his weapons temporarily for an inventory check.

and possessing unregistered firearms. Prior to his arrest on related charges, he was summoned to the SBI office, separated from his supervisor, and interviewed, without *Miranda* warnings. He was then arrested and later moved to suppress all statements he made pre-*Miranda*.

In finding that Uzenski was not in custody prior to his arrest, the Fourth Circuit noted that "[f]irst, Uzenski has not controverted that he voluntarily arrived at the SBI Office and secured his weapon in his patrol car. Second, the mere fact that the interview took place at the SBI Office and did not involve [Uzenski's supervisor] did not convert it into a custodial interrogation." *See id.* (internal citations omitted). This is despite the fact that during the interview, Uzenski was not even allowed to use the bathroom unaccompanied by an agent. *See id.* at 698.

Norman attempts to distinguish *Uzenski* by characterizing the Uzenski's actions of reporting to an SBI office upon request as Uzenski "initiating the encounter," *see* Docket Entry 31, at 19. To Norman, the SBI compelling Uzenski's appearance (sans weapons) at their office was apparently less coercive than Norman's direct supervisor asking him to come to his own office on a day he was already on duty.

In sum, under binding precedent, no reasonable person in Norman's position would have objectively believed he was not free to leave or terminate the interview that took place on July 7.

B. *Norman had no objectively reasonable basis to believe that he was required to participate in the interview or else lose his job.*

*Garrity* does not insulate all government employees from ever answering questions put to them that might bear on misconduct. *Garrity* only prohibits agencies from compelling self-incriminating statements through threat of termination.[10] What occurred here does not approach that.

Unlike the situation in *Garrity*, wherein "each appellant was warned … that if he refused to answer he would be subject to removal from office," *see id*. at 494, no one – from NCSHP or any state or federal agency – stated, suggested, or *even implied* that Norman's continued employment was contingent on speaking with anyone that day. To the extent Norman interacted with NCSHP personnel that morning prior to the interview, Sgt. Catherwood's behavior and

---

[10] And, to the extent that Norman would argue that the specter of "desk duty" (which Sgt. Catherson could not even impose) triggers coercion, the case law suggests otherwise. As the Seventh Circuit noted in *Chan*, "not every consequence of invoking the Fifth Amendment is considered sufficiently severe to amount to coercion to waive the right" because "the effect must . . . be capable of forcing the self-incrimination." *Chan v. Wodnicki*, 123 F.3d 1005, 1009 (7th Cir. 1997) (internal quotation marks omitted) (citing supporting cases from the Supreme Court and the Seventh Circuit and noting that law-enforcement agency's threat that an officer will be transferred or assigned "desk duty" if he or she refuses to answer questions is probably not sufficient for a statement to be considered "compelled").

22

demeanor in asking Norman to come to his regular workplace on a day he was on duty was not threatening or even abnormal.

Nor did the interviewing agents issue any of the direct or even implied threats of adverse employment action that *Garrity* prohibits. And, it is undisputed that "[Norman]'s supervisors were not present during his questioning and never indicated to him that his job would be in any greater jeopardy if he failed to cooperate." *See United States v. Trevino*, 215 F. App'x 319, 322 (5th Cir. 2007) (unpublished). To this point, *Trevino* is instructive; there, the defendant was a correctional officer suspected of sexual misconduct. Trevino's direct supervisor ordered him to report to work on a day he was off-duty and "personally escorted him to the room where Skylor Hearn, a Texas Ranger, was waiting and stated: '[t]his man needs to talk to you.'" *See id.* at 320. Trevino initially denied the misconduct and then admitted to it. The Ranger then advised him of his *Miranda* rights and provided Trevino's statement to his supervisor, who fired him. *Id.*

The district court found no *Garrity* violation and the Fifth Circuit – applying the subjective/objective analysis of *Vangates* and *Friedrick* – affirmed, noting that the interview was not coercive, as no one threatened Trevino with loss of employment and he was advised he could leave at any time. *See id.* at 322. Here, as in *Trevino*, Norman

23

was not told that []he would be dismissed if []he failed to answer the questions asked of h[im]; was not asked to sign a waiver of immunity; and had no statute mandating dismissal for refusal to answer hanging over h[is] head. Accordingly, [Norman] was not put between the rock and the whirlpool, as were the plaintiffs in the *Garrity* line of cases. Instead, []he was standing safely on the bank of the stream.

*Singer v. Maine*, 49 F.3d 837, 847 (1st Cir. 1995) (quotation and citations omitted). And, to the extent Norman argues he held a subjective belief of potential termination, the inaccuracies in his sworn statement undercut his credibility. Finally, even taking his representations at face value, they are not objectively reasonable, based on the circumstances.

## III.   CONCLUSION

In his interview, Norman stated that he knew Hudson had gone to "prison" for stabbing someone. Norman told agents that he bought firearms for other people and in so doing, lied under penalty of perjury on the Form ATF-4473 that he was buying those firearms for himself.[11] Put simply, Norman admitted to committing federal crimes and he now regrets that. But that does not mean that his will was overborne by some perceived coercion as Norman now claims. It does not mean he was threatened with losing his job. By any objective standard, knowing what Norman knew at the time, he was not in

---

[11] This also constitutes a federal felony; however, this conduct occurred in the Eastern District of North Carolina.

24

custody during his conversation with state and federal agents. No one threatened his continued employment. His argument rests upon inaccuracies that, even if accepted as true, do not amount to a Constitutional violation. His motion should be denied.

This the 2nd day of February, 2022.

Respectfully submitted,

SANDRA J. HAIRSTON
UNITED STATES ATTORNEY

/S/ JOANNA G. MCFADDEN
Assistant United States Attorney
NYSB #4500948

/S/ JOHN M. ALSUP
Assistant United States Attorney
NCSB #43386

United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth St., 4th Floor
Greensboro, NC  27401
Phone:  336/333-5351

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 2, 2022, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Joshua B. Howard, Esq.

Respectfully submitted,

SANDRA J. HAIRSTON
UNITED STATES ATTORNEY

/S/ JOANNA G. MCFADDEN
Assistant United States Attorney
Deputy Chief, Criminal Division
NYSB #4500948
United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth St., 4th Floor
Greensboro, NC 27401
Phone: 336/333-5351

26