UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
NO. 1:21-CR-373-1

_____

UNITED STATES OF AMERICA,


v.


TIMOTHY JAY NORMAN.

_____




**DEFENDANT TIMOTHY NORMAN'S SENTENCING MEMORANDUM**

Joshua Howard
NC Bar No. 26902
Gammon, Howard & Zeszotarski, PLLC
115 ½ West Morgan Street
Raleigh, NC 27601
(919) 521-5878
Fax: (919) 882-1898
jhoward@ghz-law.com

John J. Dowling III.
NC Bar No. 57517
Dowling Defense Group LLC
1449 S Church St, # 209
Charlotte, North Carolina 28203
Ph: 631-574-7905
E: john@dowlingdefensegroup.com

Dated:    May 27, 2022
          Raleigh, NC

# TABLE OF CONTENTS

INTRODUCTION

ARGUMENT

I.  There are two objections to the PSR for the Court's resolution.

    A.  It is an abuse of the abuse of trust enhancement to apply it to private, retail sales in this context.

    B.  The actual parties to the matter agree the number of guns enhancement is overstated.

        1.  The Lawmen's Purchases: The enhancement does not create a presumption that guns purchased equals guns unlawfully sold.

        2.  The Home Collection was not involved in the offense.

II. The downward variance Probation has recommended is well-advised.

    A.  Probation's starting point is mistaken, but the extent of the variance should be preserved.

    B.  The value of the Court's discretion to recognize Section 3553(a)'s supremacy over the guidelines is reified by this case.

        1.  Several factors countenance a reduced confinement penalty.

            a.  Recidivism, deterrence, and respect for the law.

            b.  Unwarranted sentencing disparities.

        2.  Collateral consequences in this case are dramatic.

CONCLUSION

CERTIFICATE OF SERVICE

# INTRODUCTION

Now comes Defendant Tim Norman and submits this sentencing brief in aid of the Court's sentencing decisions. The defense believes two proposed enhancements in the Presentence Investigation Report ("PSR") are inappropriate, but the Probation Office's recommendation of a substantial downward variance is well-founded for reasons appearing in the PSR as well as those herein asserted.

# ARGUMENT

**I.   There are two objections to the PSR for the Court's resolution.**

    **A.   It is an abuse of the abuse of trust enhancement to apply it to private, retail sales in this context.**

The PSR assumes that the abuse of trust enhancement applies because Norman purchased firearms from a store that sells to only a subset of gun buyers. The Government embraces that argument but adds that Norman also abused his position as a member of law enforcement by accessing (although unsuccessfully) a database—namely, CJ Leads—to determine if potential buyers had criminal records. Neither of these theories pushes Norman's conduct over the threshold because neither the Lawmen's marketing strategy nor the failed CJ Leads searches "contributed in some significant way to facilitating the commission or concealment of the offense." App n.1 to USSG § 3B1.3.

The abuse of trust enhancement calls for a 2-level increase in offense level "[i]f the defendant abused a position of public or private trust, or used a special skill, in a

manner that significantly facilitated the commission or concealment of the offense[.]" USSG § 3B1.3. The term "position of public [] trust" is defined by the application notes as follows:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, *the position* of public or private trust *must have contributed in some significant way to facilitating the commission or concealment of the offense* (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).

App n.1 to USSG § 3B1.3 (emphasis added).

It appears application of a two-level enhancement is substantially premised upon Norman's access to a private, commercial gun store that voluntarily limits its sales to specified communities of people.[1] It appears the Probation Office is under the same impression as the Government that Lawmen's only sells guns to law enforcement officers. *See* Gov't Pos. Paper at 13 (ECF No. 60) ("a retailer . . . that *only sold to law enforcement officers*.") (emphasis original).

---

[1] We further understand the Probation Office relies in partial part upon allegations from an unreliable meth addict that he bought heavier-than-usual ammunition from Hudson. The defense is unaware of any allegation Norman took these from NCSHP resources, so it stands to reason it came from Lawmen's. This alternative premise therefore rises and falls with the same issue: whether Norman's access to a private, commercial entity can support this enhancement.

4

This impression is incorrect. The defense engaged former SBI Special Agent in Charge of Financial Crimes Lawrence Young early on in this case. Retired SA Young has purchased from Lawmen's countless times both during his active service and in retirement. On May 17, 2022, he went to Lawmen's and confirmed with their long-time sales representative the same thing that appears in the "About" section of Lawmen's website[2]: they restrict sales to certain groups that include current and former firemen, EMTs, and magistrates. EMTs are not sworn officers and have no particular firearm training or mandates. Indeed, they are frequently private-sector actors. As such, leveraging the marketing strategy of a private business engaged in private retail sales into the basis for this enhancement is unwarranted. This enhancement would not apply if Norman had been retired at the time of the relevant purchase; yet he could have made the same buys. The sales strategy of a private gun store is no basis for this application.

In addition, to the extent the PSR or the Government would rely on Norman's accessing the CJ Leads application to check the criminal records of potential buyers, that is no basis to apply the enhancement. The Government admits that Norman did not have success in searching up the name of one of the buyers (the informant); no surprise, because the FBI directed the informant to use an alias. A failed search attempt that yielded no fruit cannot be said to have "contributed in some significant way to facilitating the commission or concealment of the offense." App n.1 to USSG § 3B1.3.

---

[2] Available at: https://www.lawmens.com/about-us/

### B. The actual parties to the matter agree the number of guns enhancement is overstated.

The PSR assumes a much larger number of firearms than were actually involved in the offense. *See* PSR ¶ 49. And the Government agrees. ECF No. 60 at 10. The correct number of firearms involved in the offense should be 8-24, *id.*, rather than the 86 that the PSR recommends. PSR ¶ 49. If the Court agrees with the parties, then Norman's total offense level should drop from 21 to 19 (without considering the subtraction requested above relating to abuse of trust).

The number of arms included by the PSR is inflated for three reasons. First, the PSR treats the enhancement as creating a presumption that guns purchased equals guns unlawfully sold. Second, the caselaw does not support sweeping in firearms that were kept at home and not unlawfully distributed. Third, the text of the Guideline and application note are limited to those arms that "were . . . unlawfully distributed."

The PSR identifies two groups of firearms for a total of 86 firearms involved in the offense. PSR ¶ 49. The first group is 35 firearms Norman bought from Lawmen's between January 1, 2021 and July 12, 2021 (the "Lawmen's Purchases"). *Id.* The second group is the 51 firearms Norman had at home (the "Home Collection"). *Id.*

The number-of-firearms enhancement increases an offender's sentencing exposure based on the number of firearms "involved" in the offense. USSG § 2K2.1(b)(1). An application note explains how to determine the number of firearms involved:

> For purposes of calculating the number of firearms under subsection (b)(1), count only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed, including any firearm that a defendant obtained or attempted to obtain by making a false statement to a licensed dealer.

App. n.5 to USSG § 2K2.1. Simplified, the Application Note spells out four categories of firearms "involved" in an offense:

> (1) firearms the offender attempted to unlawfully possess;
> (2) firearms unlawfully possessed;
> (3) firearms unlawfully distributed; and
> (4) firearms obtained or attempted to be obtained by making a false statement to a dealer.

App. n.5 to USSG § 2K2.1.

The Sixth Circuit has recognized that "[v]ery few cases have dealt with the meaning of [the number-of-firearms enhancement] in the context of unlawful possession of firearms by individuals found to be dealing in firearms without a license." *United States v. Kish*, 424 F. App'x 398, 408 (6th Cir. 2011) (unpublished).

The Government bears the burden of proving by a preponderance of the evidence that a sentencing enhancement applies. *United States v. Kobito*, 994 F.3d 696, 701 (4th Cir. 2021). This includes proving the factual predicate necessary to establish the enhancement. *United States v. Garnett*, 243 F.3d 824, 828 (4th Cir. 2001).

7

### 1. The Lawmen's Purchases: The enhancement does not create a presumption that guns purchased equals guns unlawfully sold.

The PSR concludes that all of the 35 firearms in the Lawmen's Purchases were involved in the offense. But the unlicensed dealing offense does not trigger a status that attaches to an individual at the moment he begins selling firearms illegally, automatically sweeping in *any* firearms distributed by that person during the timeframe alleged in the indictment or embraced by relevant conduct. This is supported by a practical point and a textual point.

Practically, it is possible, and in this case, likely, that those who engage in unlicensed dealing will also partake in lawful transactions during the relevant timeframe. This may include lawful trades to friends and family, gifts, and lawful sales that lack a profit motive. Indeed, the statute defining the offense of conviction expressly excludes "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby" or the sale of "all or part of [a] personal collection of firearms[.]" 18 U.S.C. § 921(a)(21)(C). Especially in a case like this involving an avid firearms enthusiast who spent decades building a personal collection of rare collector's items that continuously expanded and contracted, the presumption that all of the Lawmen's Purchases were "unlawfully distributed" is unfounded.

A presumption that the Lawmen's Purchases were all unlawfully distributed finds no support in the text of the enhancement. To begin with, consider what the

8

Application Note says: it instructs us to "count *only* those firearms that *were*" unlawfully possessed, unlawfully distributed, etc.

Next, consider what the note omits: anything about a presumption. This is significant because other areas of the Guidelines do include presumptions relating to enhancements. *See, e.g.*, App. n.4(C)(ii)(II) to USSG § 2B1.1 (presumed number of victims for mail theft); App. n.3(B) to USSG § 2A3.2 (presumption of undue influence in sex crimes); App. n.3(B) to USSG § 2G1.3 (same). The inclusion of presumptions in other areas shows that the Sentencing Commission knows how to include them when it wants to. Here, it did not include a presumption in Section 2K2.1(b)(1) or the accompanying application note but instead included the command to "count only those firearms" in the four categories listed. *See* App. n.5 to USSG § 2K2.1.

### 2. The Home Collection was not involved in the offense.

The caselaw, to the extent there is any, does not support the notion that the Home Collection was "involved" in the offense. The defense is aware of only two cases that address whether or not an idle collection of firearms is properly considered "involved" in an unlicensed dealing offense.

One court held that the enhancement is limited to those arms unlawfully distributed and should "not include the other firearms made available for sale by defendant, or firearms that were obtained during a search warrant of the defendant's home." *United States v. McGowan*, No. 12-cr-207, DE 398 at 7 (E.D. Cal. Jun. 30, 2016) *aff'd*, 746 F. App'x 679 (9th Cir. 2018) (unpublished). We think the *McGowan* holding is

9

faithful to the text of the enhancement. The application note lists four categories of arms that are involved in the offense, including arms that "were . . . unlawfully distributed." It says nothing about arms that were made available for sale.

Another court, however, has held that the number of firearms in an unlicensed dealing case includes those "distributed *and made available for sale*." *United States v. Kish*, 424 F. App'x 398, 409 (6th Cir. 2011) (unpublished) (emphasis added). That holding is problematic because it finds no support in the text of the Guideline or the application note. But even if one could find a way to read the application note in the way the *Kish* court did, the Home Collection in this case would still not qualify as including arms "made available for sale" under the standard in *Kish*. The *Kish* court found that arms are "made available for sale" when there is evidence that the offender took affirmative steps evincing an intent to sell the arms illegally such as by placing price tags on them. *See id.* The defendants in *Kish* had nearly 500 firearms, "most[ly] with price tags," placed in a "showroom" at a store called "Highland Gun Barn." *Id.* at 399, 404. So it was somewhat obvious that those arms were on sale because the defendants had taken numerous steps to market and make the arms available for sale.

Here, even under the standard used in that out-of-circuit, unpublished decision, there is no basis to conclude that all of the arms in the Home Collection were on sale. Federal agents found the Home Collection in Norman's home and there was no showroom or price tags.

\* \* \*

10

The remedy for these two objections should result in a 4 offense-level decrease to a final level 17 and a pre-variance advisory guideline range of 24 to 30 months.

## II. The downward variance Probation has recommended is well-advised.

The Probation Office has recommended a downward variance from a starting point of 37 to 46 months down to 24 months.

### A. Probation's starting point is mistaken, but the extent of the variance should be preserved.

Defendant's argument for a lower starting point is established above in the first section of this brief. Yet Probation's detailed rationale for a significant variance is well-advised.

### B. The value of the Court's discretion to recognize Section 3553(a)'s supremacy over the guidelines is reified by this case.

#### 1. Several factors countenance a reduced confinement penalty.

##### a. Recidivism, deterrence, and respect for the law.

Tim Norman has suffered months and months in home confinement during the pendency of this case. He lost his otherwise-admirable law enforcement career, his salary and benefits, and whatever pride a congenitally modest man carries. He has no meaningful previous criminal history and presents no meaningful risk of recidivism. The only part of this brief, prior episode he will return to is church, family, and work. Indeed, Tim's case has been and will continue to be widely-reported in local media; any deterrent value has already registered with the relevant communities of thought. These

11

points, along with the collateral consequences analysis below, show none of the Section 3553(a) factors that might normally call for a guideline sentence are already met.

### b. Unwarranted sentencing disparities.

Yet a downward variance is appropriate in to avoid unwarranted sentencing disparities among similarly situated offenders. 18 U.S.C. § 3553(a)(6). A below-Guidelines sentence in this case is on par with the sentencing pattern across federal districts nationwide.

Defense counsel have reviewed some eleven cases involving a conviction for dealing in firearms without the appropriate federal license. In most cases reviewed, courts varied downward—indeed, substantially downward—from the Guideline range. Figure 1, below, captures a compressed set of examples from the full table prepared and reproduced in Exhibit B (the "Disparity Chart").

**Figure 1: Select FFL Cases and Sentences**

| Case | Guidelines | Sentence | % of downward variance |
|---|---|---|---|
| U.S. v. Gourdikian | 30-37 | 12 + 1 day | 60% |
| U.S. v. Fernandez | 63-78 | 33 | 48% |
| U.S. v. Harris | 51-63 | 46 | 10% |
| U.S. v. McGowan | 33-41 | 18 | 45% |
| U.S. v. Laraway | 30-37 | 18 | 40% |
| U.S. v. Jones | 37-46 | 1 day | 99% |
| U.S. v. Boggs | 27-33 | 8 | 70% |

In many of the cases in the Disparity Chart, which is much more comprehensive than Figure 1, the offenders were convicted of many more crimes than Norman, their criminal episodes lasted substantially longer than Norman's, they dealt more firearms

than Norman, or all the above. The courts in all those cases, however, imposed below-Guidelines sentences. For example, in *United States v. Laraway*, the offender was found to have sold over 400 arms without a license and was sentenced to 18 months despite a Guideline range calling for at least 30 months. No. 3:16-cr-22 (E.D. Va. 2016). In another, the offender pled guilty to making a false statement to a dealer and to selling arms without a license; the offenses involved over 100 arms over a three year period. *United States v. Gourdikian*, No. 2:18-cr-104 (C.D. Cal 2019). That offender was sentenced to 12 months and a day despite a low-end Guideline range of 30 months. *Id.*

In the present case, a sentence of probation is appropriate because it responds to the comparatively fewer number of firearms involved in the offense, the shorter duration of the crime in this case, and the number of offenses of which Norman was convicted.

### 2. Collateral consequences in this case are dramatic.

The Court should consider the substantial, irreversible hardship that will ensue for Norman based on his loss of a constitutional right and a lifelong passion.

Collateral consequences of a felony conviction are appropriately considered for both "just punishment" and "adequate deterrence" under 18 U.S.C. § 3553(a)(2)(A)-(B). *United States v. Nesbeth*, 188 F. Supp. 3d 179, 181 (E.D.N.Y. 2016) (discussing the issue at length). In the Fourth Circuit, collateral consequences are appropriately considered in fashioning a sentencing package that results in just punishment and adequate deterrence. *See United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007) (loss

13

of teaching permissions and state pension appropriately considered under § 3553(a)(2)(A)-(B)). Indeed, the district court's duty to make an "individualized assessment" of the offender before it, *Gall v. United States*, 552 U.S. 38, 49-50 (2007), and the tradition that "the punishment should fit the offender and not merely the crime[,]" *Pepper v. United States*, 562 U.S. 476, 487-88 (2011), underscores the importance of considering the weight and detriment a particular punishment (whether direct or collateral) will have on an individual offender.

In a case like this, sometimes the "conviction *itself* already visits substantial punishment on the defendant." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (emphasis added) (quoting the lower court). "It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *Id.*

This is not to say that *any* collateral consequence is a proper consideration under Section 3553(a)(2)(A)-(B). For example, a defendant's claim that he has already suffered enough because of adverse pre-trial publicity and reputational damage is properly dismissed. *See United States v. Sorenson*, 233 F. Supp. 3d 690, 703 (S.D. Iowa 2017), *aff'd*, 705 F. App'x 481 (8th Cir. 2017) (unpublished). But definite, irreversible collateral consequences that follow a felony conviction by operation of law are properly taken into the mix. Here, Norman's felony conviction will prohibit him from possessing a firearm—hunting, shooting, target practice, or even mere collecting—for the rest of his life. 18 U.S.C. § 922(g)(1). And subject to very narrow exceptions not applicable here,

14

federal law does not authorize expungement of felony convictions. *Doe v. United States*, 833 F.3d 192, 198 (2d Cir. 2016).

Other courts have held that collateral consequences are appropriately considered when a district court makes its individualized assessment of an appropriate sentencing package. *E.g.*, *Pauley*, 511 F.3d at 474; *Nesbeth*, 188 F. Supp. 3d at 181. Some of those cases involved the loss of a professional license or the loss of government entitlements—i.e., privileges. Here, however, the most potent collateral consequence for Norman is not the loss of a privilege, but the loss of a constitutional right. For the rest of his life. So to the extent that courts have considered collateral consequences related to the loss of privileges in the "just punishment" analysis, § 3553(a)(2)(A), that consideration applies with greater force when the punishment is the wholesale stripping of a constitutional right.

Holding that an offender will be adequately punished, in part, by the loss of a constitutional right or the suffering of other collateral consequences will not give offenders carte blanche to rely on this argument across the board. An offender must still make a showing, and the sentencing court must find, that the individual offender will actually suffer a greater degree of punishment than the average person. In other words, the loss of the right as a collateral consequence must work a substantial hardship on the offender, one that is not similarly detrimental for the average person. Here, that hardship cannot be overstated.

Norman began hunting when he was only a child. PSR ¶ 85. His father instilled in him a profound respect and deep admiration for rifles, marksmanship, and wildlife. Norman began collecting rare firearms before he was old enough to get his working papers and as he graduated into adulthood and began earning a larger salary his collection expanded to include all types of firearms like bolt actions, .22s, revolvers, repeaters, 9mm pistols, and more modern arms like semi-automatic .223s and Benelli shotguns. His collection also included special edition and customized gear like rifle bags and cases, law enforcement patches, stickers, and more.[3] Even a conservative estimate of the value of his entire collection would exceed $60,000.

Norman was proud of his collection and was enthusiastic about showcasing his special edition collector's items. He regularly attended shooting ranges and other events for gun owners. And Norman remains proud of his hunting pursuits, as taxidermic animals line the walls of his family's home. Norman passed down the family tradition of hunting to his oldest son who shot his first deer when he was seven years old. *See* PSR ¶ 82.

The unavoidable punishment for Norman's crime is that he will forever be dispossessed not only of a constitutional right, but of a lifelong passion, hobby, and

---

[3] We pause briefly to note that none of the items in Norman's collection involved anything even close to the items regulated under the National Firearms Act ("NFA") like silencers, fully automatic machine guns, enhanced triggers or bolt carrier groups, short barrel rifles or short barrel shotguns. *See* 26 U.S.C. § 5845 (listing NFA items). Norman's entire collection was limited to standard arms that are possessed and enjoyed by regular citizens.

16

robust source of enjoyment and pleasure. He asks that the Court consider this profound consequence in designing an appropriate sentencing package informed by the need for just punishment and adequate deterrence.

## CONCLUSION

Norman respectfully requests that the Court grant Defendant's objections the PSR, assign an advisory guideline offense level of 17 (providing an initial range of 24 to 30 months), and downward vary to impose a probationary sentence.

Dated:  May 27, 2022
        Raleigh, NC

> Respectfully submitted,
>
> /s/ Joshua Howard
> NC Bar No. 26902
> Gammon, Howard & Zeszotarski, PLLC
> 115 ½ West Morgan Street
> Raleigh, NC 27601
> (919) 521-5878
> Fax: (919) 882-1898
> jhoward@ghz-law.com
>
> /s/ John J. Dowling III.
> NC Bar No. 57517
> Dowling Defense Group LLC
> 1449 S Church St, # 209
> Charlotte, North Carolina 28203
> Ph: 631-574-7905
> E: john@dowlingdefensegroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2022, I served a copy of the foregoing sentencing memorandum through the electronic service function of the Court's electronic filing system on counsel for the United States.

Dated:    May 27, 2022
               Raleigh, NC

<u>/s/ Joshua Howard</u>