IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CASE NO. 1:21CR373-1 |
| ) | |
| vs. ) | |
| ) | Greensboro, North Carolina |
| TIMOTHY JAY NORMAN ) | June 2, 2022 |
| _____ | 9:32 a.m. |

TRANSCRIPT OF THE **SENTENCING HEARING**
BEFORE THE HONORABLE CATHERINE C. EAGLES
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

| | |
|---|---|
| For the Government: | JOANNA G. MCFADDEN, AUSA<br>Office of the U.S. Attorney<br>101 S. Edgeworth Street, 4th Floor<br>Greensboro, North Carolina 27401 |
| For the Defendant: | JOSHUA B. HOWARD, ESQ.<br>Gammon, Howard & Zeszotarski, PLLC<br>115 1/2 W. Morgan Street<br>Raleigh, North Carolina 27601 |
| | JOHN J. DOWLING, ESQ.<br>Dowling Defense Group, LLC<br>1449 S. Church Street, Suite 209<br>Charlotte, North Carolina 28203 |
| Court Reporter: | BRIANA L. BELL, RPR<br>Official Court Reporter<br>P.O. Box 20991<br>Winston-Salem, North Carolina 27120 |

Proceedings recorded by mechanical stenotype reporter.
Transcript produced by computer-aided transcription.

US v. Timothy Norman  -- Sentencing -- 6/2/22

P R O C E E D I N G S

1

2     (The Defendant was present.)

3          **MS. McFADDEN:**  Good morning, Your Honor.

4          Your Honor, may it please the Court, the first matter

5 on the calendar today is United States versus Timothy Jay

6 Norman.  That's Docket No. 1:21CR373-1.  Mr. Norman is present,

7 and he's represented by Mr. Dowling and Mr. Howard, and the

8 matter has been calendared for sentencing.

9          **THE COURT:**  Let me get everything up on my computer

10 here.  I think I have it.

11          Mr. Norman is here and Mr. Howard.

12          **MR. HOWARD:**  Good morning, Your Honor.

13          **THE COURT:**  And Mr. Dowling?

14          **MR. DOWLING:**  Yes.  Good morning, Your Honor.

15          **THE COURT:**  I'm sorry.  I was having a moment.

16          So I've read the presentence report.  I read the

17 objections filed before it was finalized, and then I looked

18 obviously at your position papers.  I saw the many letters of

19 support filed by the Defendant and a chart that the Defendants

20 filed.  I think they called it a disparity chart.

21          Did I miss anything?

22          **MS. McFADDEN:**  Your Honor, I filed two position

23 papers, one related to the objections and the other related to

24 3553(a).  I just wanted to confirm that the Court received both

25 of those.

US v. Timothy Norman  -- Sentencing -- 6/2/22

1          **THE COURT:**  I see the sentencing one was one filed

2    before the presentence report was finalized.

3          **MS. McFADDEN:**  Yes.

4          **THE COURT:**  Okay.  I did see both of them then.

5          **MS. McFADDEN:**  Thank you.

6          **THE COURT:**  So it looked like to me -- I know there's

7    some objections to the presentence report.

8          First, before we get to that, Mr. Howard, are you

9    primarily going to be speaking for Mr. Norman?

10         **MR. HOWARD:**  Your Honor, I would like to handle the

11   bulk of the argument.  However, as to the two guideline

12   objections, Mr. Dowling, my cocounsel, has actually done the

13   laboring work, did most of the writing and research.  If it

14   would please the Court, I would ask that you recognize him as

15   to those two.

16         **THE COURT:**  I will.  Let me cover some preliminary

17   matters with you and Mr. Norman.  I take it -- I know you all

18   have read the presentence report because I've read your

19   materials.

20         Have you gone over it with Mr. Norman?

21         **MR. HOWARD:**  I have, Your Honor.

22         **THE COURT:**  And have you discussed the guideline

23   calculation and your objections to it with him?

24         **MR. HOWARD:**  We have.

25         **THE COURT:**  And did you go over all of the conditions

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  of supervised release recommended by the probation officer with

2  him?

3           **MR. HOWARD:**  We have, Your Honor.

4           **THE COURT:**  And you went over the reasons the

5  probation officer suggested that support the probation

6  officer's recommended sentence with him?

7           **MR. HOWARD:**  Correct.

8           **THE COURT:**  Okay.  Now, I want to look at paragraph

9  34 specifically of the presentence report.  The only factual

10  objection I saw -- and this -- it was not clearly made, but

11  there was a lot of discussion about who this business called

12  Lawmen's sold to.  And as it is worded there, it says,

13  "Lawmen's, who only sells to law enforcement officers..."

14         So I understood from the brief -- the briefing filed

15  afterwards that the Defendant -- well, before and after, the

16  Defendant objects to that factual statement as incomplete; is

17  that right?

18           **MR. HOWARD:**  That is certainly their calling card and

19  a marketing --

20           **THE COURT:**  Say again?

21           **MR. HOWARD:**  That is Lawmen's calling card, that they

22  have a limited audience.  Even on their own website, they

23  explain that they also --

24           **THE COURT:**  I'm asking you a much more limited

25  question.  You're objecting to that factual statement as

US v. Timothy Norman  -- Sentencing -- 6/2/22

```
 1  incomplete?
 2          MR. HOWARD:  Correct, Your Honor.
 3          THE COURT:  All right.  It sounded like the
 4  Government didn't really dispute that it was incomplete; is
 5  that right?
 6          MS. McFADDEN:  No, Your Honor.
 7          THE COURT:  It's wrong or it's right?
 8          MS. McFADDEN:  Sorry.  We don't dispute that it is
 9  incomplete.  I'm happy to clarify that, but just for the
10  limited question the Court asks, we agree with the defense
11  counsel.
12          THE COURT:  Okay.  I can amend it to say it sells to
13  a limited clientele, including law enforcement officers and
14  other first responders, something like that.  I mean, you all
15  can tell me how you want me to reword it.  That is true, right;
16  it is a limited clientele?
17          MR. HOWARD:  It is a self-limited clientele.
18          THE COURT:  Self-limited.
19          MR. HOWARD:  It includes nonsworn first responders.
20  The relevance to that ultimately, Your Honor --
21          THE COURT:  I understand the relevance of it.  I am
22  just trying to get the facts straight, and I will hear from you
23  about the meaning of it.  But this is the only factual
24  objection I saw, and I guess that's what I am trying to get to.
25          Is that right?
```

US v. Timothy Norman  -- Sentencing -- 6/2/22

```
 1            MR. HOWARD:  Yes, Your Honor.
 2            MS. McFADDEN:  That's correct, Your Honor.  And I
 3   would agree with the Court's summary of the amended facts.
 4            THE COURT:  All right.  And in a second I will let
 5   you all tell me exactly how you want me to word it, but that's
 6   the only factual problem.
 7            Stand back up, Mr. Norman and Mr. Howard.
 8            Now, there's objections to the guideline
 9   calculations, and I see those.  And, Mr. Howard, what you've
10   objected to -- just to summarize, you're contending that it
11   should be a plus-four enhancement for the number of guns, not a
12   plus-six; correct?
13            MR. HOWARD:  Yes, Your Honor.
14            THE COURT:  And you object to the plus-two
15   enhancement for the abuse of trust enhancement?
16            MR. HOWARD:  Correct.
17            THE COURT:  Are there any other objections to the
18   presentence report?
19            MR. HOWARD:  No, Your Honor.
20            THE COURT:  Okay.  Mr. Norman, have you read your
21   presentence report?
22            THE DEFENDANT:  Yes, Your Honor.
23            THE COURT:  Have you enough time to talk to your
24   lawyers --
25            THE DEFENDANT:  Yes, ma'am.
```

US v. Timothy Norman  -- Sentencing -- 6/2/22

1          **THE COURT:**  -- about it, and do you have any

2  questions about the presentence report?

3          **THE DEFENDANT:**  No, ma'am.

4          **THE COURT:**  You heard -- we went over the objections

5  very specifically.  Those are the only objections, as I

6  understand it, from your lawyer.  The factual problem about who

7  Lawmen's sells to, which I am going to fix, and then the

8  objection to the number of guns and the abuse of trust

9  enhancement.

10          Do you understand that?

11          **THE DEFENDANT:**  Yes, ma'am.

12          **THE COURT:**  Do you have any other objections to the

13  presentence report?

14          **THE DEFENDANT:**  No, ma'am.

15          **THE COURT:**  Now, did your lawyers go over with you

16  the guidelines and the recommendations of the probation

17  officer?

18          **THE DEFENDANT:**  Yes, ma'am.

19          **THE COURT:**  And did you look specifically with your

20  attorneys at the recommended conditions of supervised release?

21          **THE DEFENDANT:**  Yes, ma'am.

22          **THE COURT:**  Do you have any questions about them?

23          **THE DEFENDANT:**  No, ma'am.

24          **THE COURT:**  All right.  You can be seated.

25          And the objections I saw from the Government -- you

        US v. Timothy Norman  -- Sentencing -- 6/2/22

1    join the objection about the enhancement for the number of

2    guns; correct?

3              MS. McFADDEN:  That's correct, Your Honor.

4              THE COURT:  Did you have any other objections?

5              MS. McFADDEN:  We did not, Your Honor.

6              THE COURT:  All right.  So the first thing -- oh, and

7    I'm -- let me just address the conditions of supervised release

8    for a minute.  They certainly all seem reasonable to me; but if

9    anybody has any objections to them, I will need you to state

10   them in just a second.

11             The probation office suggested waiving the mandatory

12   drug testing requirement, but I'm not sure about that.  There

13   was some discussion of drug use and some suggestion of

14   prescription drug abuse.  So I am not inclined to do that; but

15   if anybody wants to be heard on that, you know, at the

16   appropriate time you can let me know.

17             Did anyone object to any of the conditions of

18   supervised release that the probation officer suggested?

19             MS. McFADDEN:  No, Your Honor.

20             MR. HOWARD:  No, Your Honor.

21             THE COURT:  So what I propose to do is to hear from

22   counsel about their objections.  Then after I rule on the

23   objections and find the guidelines, then I will hear from you

24   on the 3553(a) factors.  So we'll do it in two parts if that's

25   -- that's just how usually I do it, so it shouldn't be a

              US v. Timothy Norman  -- Sentencing -- 6/2/22

1  surprise.

2          I would ask counsel specifically, when we're talking

3  about the number of guns -- because I think the Government

4  actually agreed with this.  The Government and the Defendant

5  said in their papers that the Defendant gave guns to family and

6  friends, and this was confirmed by law enforcement.  I did not

7  see that in the presentence report.  So if it is in there,

8  please point it out to me.  If it is not in there, perhaps it

9  should be added.

10          But I would like you to address the cost of that

11  because, you know, I just -- it seemed to me a fair inference

12  that we have more than I think it's 24 guns.  Whether it's 80

13  some odd or not, if it's more than 24, it is the plus-six

14  enhancement, as I understand it.  I don't know if it's 86 or

15  84, whatever the probation officer said, but I'm having a hard

16  time with it not being over 24, given the facts.

17          I mean, he said to law enforcement, I think, that he

18  was reselling to family and friends.  So I just kind of

19  question that whole gift thing, but you all -- partly because,

20  you know, just how much money we would be talking about, but

21  you all can address that when we talk about the guns.

22          I think I understood your arguments otherwise.  I'm

23  not trying to cut you off.  I am just telling you what my

24  questions are.

25          All right.  So why doesn't the Government go first

       US v. Timothy Norman  -- Sentencing -- 6/2/22

1 | since you do object to the number of guns, and then I will hear
2 | from the Defendant on all of your objections.
3 |         **MS. McFADDEN:**  Your Honor, if I may, could counsel
4 | and I just briefly approach the bench?
5 |         **THE COURT:**  Yes.
6 |      (The following proceedings were had at the bench by the
7 |       Court and Counsel:)
8 |         **MS. McFADDEN:**  Your Honor, as the Court may recall,
9 | one of the provisions of Mr. Norman's plea agreement was that
10 | he provide information to law enforcement.
11 |         **THE COURT:**  Yes.
12 |         **MS. McFADDEN:**  And so pursuant to that particular
13 | agreement, after he pled guilty, he and Mr. Howard came to the
14 | FBI, and they debriefed him about the location of these guns
15 | that were purchased at Lawmen's, because we had concerns about
16 | where they had gone.  He indicated that he did gift them to
17 | various friends and family, and the agents with ATF and FBI did
18 | contact those people and speak with them and confirm those
19 | facts with them.  There was a 302 prepared of this proffer --
20 |         **THE COURT:**  A what?
21 |         **MS. McFADDEN:**  I'm sorry.  An FBI 302, Memorandum of
22 | Interview, prepared.
23 |         **THE COURT:**  Okay.
24 |         **MS. McFADDEN:**  But in conversations with the
25 | probation officer, she indicated that they are not considering

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  proffered protected information.

2          THE COURT:  I see.

3          MS. McFADDEN:  While it does in this case inure to

4  Mr. Norman's favor, it was still not to be considered.  That's

5  why it did not appear in the presentence investigation report.

6          THE COURT:  Okay.

7          MS. McFADDEN:  I understand the Court's concerns in

8  terms of what inferences can be drawn, but what I wanted the

9  Court to be aware of those particular facts before we argued.

10          THE COURT:  Is that right, Mr. Howard?

11          MR. HOWARD:  That's correct, Your Honor.

12          THE COURT:  Thank you.

13          Oh, wait.  Wait.  It looked to me like I did not

14  accept the plea agreement.  I had sort of an obscure note to

15  myself.  I accepted his guilty plea.  I don't remember why I

16  didn't do that.

17          But there's no 5K; correct?

18          MS. McFADDEN:  There's no what?

19          THE COURT:  No Government motion?

20          MS. McFADDEN:  There is no 5K, Your Honor.

21          THE COURT:  Thank you.

22       (End of bench conference.)

23          THE COURT:  Okay.  Go ahead.  Anything you want to

24  say about the guns or the abuse of trust?

25          MS. McFADDEN:  Your Honor, with regards to the number

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  of guns, I certainly understand the Court's concerns, and

2  Mr. Norman certainly did make statements indicating that he had

3  taken money, that he had purchased these guns at Lawmen's --

4          **THE COURT REPORTER:**  I'm sorry.  I need you to get

5  closer to the microphone.

6          **THE COURT:**  Yes.

7          **MS. McFADDEN:**  So it's the microphone and not the

8  speed?

9          **THE COURT REPORTER:**  Yes, I'm having trouble hearing

10  you with the mask and plexiglass.

11          **MS. McFADDEN:**  But as I reviewed the case law, as it

12  relates to the number of guns enhancements and the unlawful

13  dealing cases -- as I looked at the *Karani* case in the First

14  Circuit and the *Kish* case in the Sixth Circuit, there seemed to

15  be two distinguishing factors that I think are at play in this

16  particular case.

17          As it relates to the purchases, obviously to gift,

18  the note on the 4473 purchase form in ATF does indicate you are

19  still an actual purchaser if that is the intent at the time.

20          **THE COURT:**  If you intend to give it away, it's okay?

21          **MS. McFADDEN:**  Exactly.  That's how I read that and I

22  believe how the *Karani* court read that as well.

23          And then in terms of the inventory aspect of

24  numbering the guns, no doubt that Mr. Norman had an arsenal in

25  his home.  It was a staggering number of firearms.

US v. Timothy Norman  -- Sentencing -- 6/2/22

1          But in the case law, again, as with the *Kish* case and

2     others, those cases and the Eleventh Circuit case -- the

3     name -- I haven't printed a copy, but the name escapes me.

4     It's cited in my position paper.  What the Court focused on in

5     those particular cases was the fact that guns were, you know,

6     in a separate location.  They had price tags on them.  They had

7     been offered for sale, you know, in flea market advertisements

8     or on the Internet.  That was not the case here.

9          So it is one of those issues where I certainly think

10    that the inference can be drawn -- that the Court would draw

11    based on these facts, and it would support a higher number than

12    24; but based on the case law and the evidence that we have

13    before us, I just wasn't sure if it crossed the preponderance

14    line.  So that's the reason, in an abundance of caution, we

15    took the position that we did.

16         **THE COURT:**  Because I guess -- and I will hear from

17    the Defendant on this, too -- you have evidence that he showed

18    many guns, you know, unspecified number to these buyers.  You

19    have these pictures of the guns displayed, never more than, I

20    think, four or five at a time, if I remember correctly, but

21    still a number of guns.

22         If you say he gave away -- if one says that he gave

23    away 25 guns, I mean, even if he just paid $400 for each of

24    them, which would be on the very low end of what it looked like

25    to me these guns were costing when he bought them at Lawmen's,

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  that's $10,000.  That seems -- in a fairly short period of

2  time, that seems not completely credible.  I mean, maybe he

3  gave away some of them, but even if it's just 20 guns, that's

4  still many thousands of dollars.

5      And then, you know, he said -- don't I remember

6  correctly he told law enforcement he sold some to family and

7  friends?

8      **MS. McFADDEN:**  Your Honor, that is reflected in the

9  paragraph that Your Honor had identified regarding Lawmen's.  I

10  agree there is some tension in the facts, as we've understood

11  them, as they've played out in this case.

12      **THE COURT:**  All right.

13      **MS. McFADDEN:**  And I think that the Court's point

14  regarding the finances is also a very insightful and valid

15  point as to this case because there is a bit of opacity to what

16  the circumstances of the finances are.

17      When Mr. Norman was arrested and his car was

18  searched, there was an envelope with cash found in it.  I

19  believe it was just right around $2,000.  So it wasn't an

20  amount that would indicate whether or not the firearms were

21  being purchased and immediately sold.  But I agree with the

22  Court that those are certainly salient facts that would support

23  the inference the Court is discussing.

24      **THE COURT:**  Did you want to say anything about the

25  abuse of trust enhancement?

US v. Timothy Norman  -- Sentencing -- 6/2/22

1          **MS. McFADDEN:**  Your Honor, I think the case law on
2    this is clear.  I mean -- and you don't need to find anything
3    specific in terms of Mr. Norman's situation to support it.  The
4    abuse of trust enhancement says it relates to facilitating the
5    commission or the concealment of the crime.
6          And, here, you know, while we may split hairs about
7    who Lawmen's sells to, you know, they sell to law enforcement
8    officers.  They sell to retired law enforcement officers.  They
9    sell to first responders.  It is a select clientele.  And
10   Mr. Norman's credentials in a position of public trust as a
11   state highway patrolman gave him access to those particular
12   firearms, and the nature of them with the seal, the law
13   enforcement agency, was one of the selling points in the
14   dealing of the firearms.
15         So I would argue to the Court that his position
16   facilitated the crime, and I'd also argue that it concealed it
17   for the two reasons that I articulated in my position paper.
18   You know, the first is that he sold to the source on the side
19   of the road in his highway patrol uniform in his highway patrol
20   car, out of the trunk of the car.  You know, I'm not sure,
21   based on the fact that this was a closed gas station, that, you
22   know, had he not been so dressed and in that car, that perhaps
23   that transaction might have attracted interest.  You know, it
24   might have seemed something similar to a hand-to-hand
25   transaction.  Obviously, you know, he was empowered with this

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  uniform and in this car that it would divert such suspicions.

2         In terms of the CJLEADS issue --

3         **THE COURT:**  What issue?

4         **MS. McFADDEN:**  The CJLEADS issue, which is the law

5  enforcement database.

6         **THE COURT:**  Oh, right.

7         **MS. McFADDEN:**  That's in the PSR.  Mr. Norman

8  accessed CJLEADS to run the license plate of the source's car.

9  Now, it didn't trace back to the source, obviously; but that

10  being said, that was a way also of covering one's tracks,

11  right, just to make sure who I am selling to, because he didn't

12  ask this person's name, person's last name, any identifying

13  information.  This was a way to make sure, you know, that he

14  knew where it was going or at least he gave it a shot to cover

15  his own tracks.

16         I would submit that based on those particular facts

17  in the PSR and the case law in the Fourth Circuit and the

18  commentary notes to the guidelines on this issue that the

19  enhancement applies.

20         **THE COURT:**  Thank you.

21         Mr. Dowling?

22         **MR. DOWLING:**  Thank you, Your Honor.

23         **THE COURT:**  We might need to put that mic up on top

24  of something to make it higher.

25         **MR. DOWLING:**  I agree.  My height is usually an

       US v. Timothy Norman  -- Sentencing -- 6/2/22

1 advantage.

2          **THE COURT:**  Well, this is a beautiful courtroom, but

3 it is hard to hear if the mics aren't close.

4          **MR. DOWLING:**  Thank you, Your Honor.

5          May it please the Court, I'm confident that a lot of

6 the Court's concerns will be addressed in the material that

7 I've already prepared.  I think it would be more natural if I

8 go through and address these concerns as prepared.

9          So as the Court is aware, the parties agree that the

10 correct number of firearms involved in this offense is between

11 8 and 24.  We think that this number is consistent with the

12 text of the enhancement, with the case law interpreting it,

13 and, most importantly, from the Court's perspective with the

14 concern raised earlier, consistent with the statute defining

15 the offense of conviction.

16          So as the Government recognized, it bears the burden

17 to prove the number of firearms by a preponderance of the

18 evidence.  That's *United States v. Kobito* cited at 994 F.3d

19 696, Fourth Circuit, 2021.

20          So I think the Court saw that in our sentencing

21 papers we sort of distinguished between the firearms that

22 Mr. Norman purchased in 2021, what we described as the Lawmen's

23 purchases, and then the firearms that he had in his home

24 collection.

25          So I think it's -- it might be wise to really drill

US v. Timothy Norman  -- Sentencing -- 6/2/22

1   down on exactly the text of the application note.  It says to

2   count -- so it says to count the number of firearms involved in

3   the offense.  Then the application note goes on to say "count

4   only those firearms that were," and then it basically spells

5   out four categories of firearms that you are supposed to

6   include.  And this is -- these categories are what the Eleventh

7   Circuit has described as exceedingly specify which firearms to

8   include.  And that's *United States v. Crudgington* at 469 F.

9   App'x 823 of 2012.  Those four categories are firearms that the

10  offender unlawfully possessed, attempted to unlawfully possess,

11  unlawfully distributed, or obtained or attempted to unlawfully

12  obtain by making a false statement to a licensed dealer.

13          With respect to the Lawmen's purchases, Probation

14  simply assumes that all of the firearms that Mr. Norman

15  purchased from Lawmen's were unlawfully distributed or

16  unlawfully possessed in some way, but we don't think that there

17  is any basis to make that conclusion.

18          Now I will respond directly to the Court's concern

19  about -- I believe in the PSR where it mentions that Mr. Norman

20  had sold some additional firearms to friends or offered them

21  for sale or had gifted some firearms.  Now, it's our position

22  that just because an individual is engaged in the business of

23  dealing in firearms without a license, that does not mean that

24  all firearms possessed or purchased during the time frame

25  embraced by relevant conduct -- that automatically there's a

US v. Timothy Norman  -- Sentencing -- 6/2/22

1 presumption that everything that you possessed or purchased --

2       **THE COURT:**  Right, I agree with you about the

3 presumption, there's no presumption, but, you know, there is an

4 inference here.  You have a lot of circumstantial evidence that

5 he's regularly selling guns, a lot of guns.  He's got a lot of

6 guns for sale.  And if he had more than 24 guns for sale,

7 whether he sold them or not, then the enhancement applies;

8 right?

9       **MR. DOWLING:**  I don't think so, Your Honor, because I

10 think that Congress -- even if we step aside from the

11 application note, which I am happy to discuss more -- but -- so

12 the statute defining the offense of conviction here -- in the

13 '80s, Congress passed the Firearms Owners' Protection Act, and

14 they really -- they really specified what it means to be

15 engaged in the business of dealing without a federal license.

16 And although, you know, you can find cases and commentary that

17 talk about how complicated the statute is, how many guns you

18 need to sell to be guilty, what's not unclear -- what is clear

19 is that the statute defining the offense says that to be

20 engaged in the business of dealing does not include occasional

21 sales to friends or transactions that lack a profit motive or

22 gifts to friends --

23       **THE COURT:**  But we don't have that here.  He had --

24 at least he, I think, has admitted that he was dealing.

25       **MR. DOWLING:**  Well, that's correct.  He's pled guilty

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  to dealing.

2          **THE COURT:**  That's right.  So?

3          **MR. DOWLING:**  So it's a question of how many can the

4  Government prove by a preponderance of the evidence.

5          **THE COURT:**  Right.  But they don't have to prove it

6  beyond a reasonable doubt that it's more than 24; right?

7          **MR. DOWLING:**  That's right.

8          **THE COURT:**  Okay.

9          **MR. DOWLING:**  But we still think that there's no way

10  to know whether or not -- or at least the Government can't

11  prove out of the Lawmen's purchases -- and I'll address the

12  home collection in a moment, but out of the Lawmen's purchases,

13  there's just no way to know which ones were lawful sales or

14  transactions and which ones were unlawful and were connected to

15  the profit motive.

16          And I think this is especially important here where

17  you have a case where Mr. Norman has been a lifelong collector

18  of firearms since he was a very young child.  This is not

19  somebody who is out there dealing drugs and has a side hustle

20  peddling firearms and doesn't really know anything about

21  firearms and something like that.  This is somebody who had a

22  large collection that he used for personal use and enjoyment.

23  It was a hobby.  There's really no way to know which firearms

24  were connected to --

25          **THE COURT:**  But I don't have to know that, do I?

Case 1:21-cr-00373-CCE   Document 67   Filed 06/23/22   Page 20 of 81

1          **MR. DOWLING:**  I think you do because I think that

2    it's -- I mean, the burden is on the Government to show by a

3    preponderance of the evidence that it's more than 24 firearms,

4    and they conceded --

5          **THE COURT:**  Well, in drug cases, just for example,

6    where weight matters to the guideline calculation, I thought

7    there were cases that said you don't have to find the specific

8    weight so long as you're satisfied by the preponderance of the

9    evidence that it's within the relevant range of weights.

10         I mean, I don't understand why I have to say this

11   gun, this gun, this gun, and this gun if I can look at all of

12   the evidence and say, look, he had 86 guns, or however many it

13   was, something like that, and it's very clear that he offered

14   for sale at least 24 of them -- more than 24 of them.

15         **MR. DOWLING:**  I think --

16         **THE COURT:**  I don't understand why that's not okay.

17         **MR. DOWLING:**  Well, I think the analogy is not very

18   appropriate because, number one, drugs are illegal; whereas

19   firearms -- you have a constitutional right to have the

20   firearms.  So I think that separates it right there.

21         And I think also in this case, Mr. Norman --

22         **THE COURT:**  You don't have a constitutional right to

23   sell them illegally or offer them for sale illegally.

24         **MR. DOWLING:**  That's absolutely right.  However,

25   under the statute defining offense of conviction, you do have

      US v. Timothy Norman  -- Sentencing -- 6/2/22

1 the right to make occasional sales to friends, gifts,

2 transactions that lack a profit motive.  And I can cite that if

3 you'd like, Your Honor.  That's in 18 U.S.C. 921.  I believe

4 it's Subsection (21) of that statute that defines what it means

5 to be engaged in the business of dealing, and it doesn't

6 specify a number.  What it says essentially is that this

7 statute -- this phrase, which is part of the criminal statute,

8 does not include gifts to friends, occasional sales, things of

9 that sort.

10         So that's really what we're saying is that where the

11 Government just does not know and can't show by a preponderance

12 of the evidence which firearms were involved in the offense

13 under one of the four categories that the Eleventh Circuit has

14 said exceedingly specify which firearms to include -- I mean,

15 because I think that it's important when you have the

16 constitutional right and you have someone who is a collector --

17 you know, I don't think it's fair to draw the inference that

18 just -- and basically adopt the presumption that all the guns

19 you had -- these must have been for sale.  You must have been

20 dealing all of them.

21         **THE COURT:**  Well, he said in paragraph 24, he sold

22 firearms to his father, his stepfather, his brother, a

23 neighbor, somebody named Juan, his cousin, and the folks

24 involved here.  I mean, if you exclude the folks involved here,

25 that's six people --

Case 1:21-cr-00373-CCE   Document 67   Filed 06/23/22   Page 22 of 81

1              MR. DOWLING:  Right.

2              THE COURT:  -- beyond what we know he sold as an

3    unlawful dealer.  I mean, when you put that -- I just -- and he

4    showed all of these guns to the folks involved in the offense

5    here.  I'm just having trouble with this.

6              MR. DOWLING:  So I think this might help.  The

7    sales -- so we concede, we agree, he did sell.  He admitted to

8    selling additional firearms to friends or family, but that's

9    really the crux of our argument, that selling firearms is not

10   illegal.  It's only illegal if you engage in the business of

11   dealing, and you do it for a profit.

12             THE COURT:  So it was just in the business when he

13   sold to the folks in the indictment, and when he sold them to

14   his family and friends, that was -- I mean, that defies

15   credibility.

16             MR. DOWLING:  I don't think so, Your Honor, because

17   those sales -- there's no evidence that they lacked -- that

18   they were connected to a profit motive.  So I don't think it's

19   fair to say that someone who is engaged in the business can't

20   also -- can't also say, you know, to their son or their brother

21   here, well, I will give you this for the same price that I

22   bought it for.  I don't think that there's sort of some status

23   that attaches to you.  Once you sell one or two, now you're an

24   unlicensed dealer and you can't do any transaction with the

25   firearm; otherwise, it will amplify your sentencing exposure.

        US v. Timothy Norman  -- Sentencing -- 6/2/22

1  I think that's strange, and I think that's inconsistent with

2  the statute defining the offense and the definition of what it

3  means to be engaged in the business of dealing.

4          **THE COURT:**  All right.

5          **MR. DOWLING:**  If the Court -- now, also I would just

6  like to respond to what the Government said about the money and

7  the Court's concern about the amount of money.

8          You know, I don't think that money is relevant for

9  the firearms enhancement, that issue specifically, because if

10  you were to sell one firearm, let's say a Golden AK-47 from the

11  Middle East, some sort of special edition firearm, for a

12  million dollars, that's only one firearm, but you could sell 50

13  firearms for $25, and I don't think it would really have any

14  impact on the number of firearms enhancement.  I think the text

15  of the enhancement is clear.  It is just a question of the

16  number and not --

17          **THE COURT:**  Well, I'm talking about circumstantial

18  evidence here.  I mean, I don't disagree with what you're

19  saying, but, you know, I see how much money he was making, and,

20  you know, he was living pretty comfortably, presumably spending

21  his income to live, and yet he -- giving him a break on the

22  numbers, he's giving away $10,000 worth of guns every year, if

23  what you're saying is so.

24          I mean, that just doesn't -- that just seems very

25  unlikely that he was not selling those guns is what I'm saying,

US v. Timothy Norman  -- Sentencing -- 6/2/22

1 or at least selling some of them. It just is -- I don't know.

2 Do people do that? Do people give away $10,000 worth of guns a

3 year when they're paying a pretty substantial mortgage and not

4 making millions of dollars a year? I don't know.

5         **MR. DOWLING:** You know, I think some people do, Your

6 Honor. I think some people do do a lot of trades. I think

7 when you talk about the collectors, whether it's cars,

8 firearms, purses, shoes, I think, you know, if you're a

9 collector, you're engaging in a lot of transactions, some of

10 them in this case unlawful and some lawful.

11         But also, you know, $10,000, that's -- that could be

12 ten firearms, which is --

13         **THE COURT:** Well, I was using 25 at $400 a gun. If

14 he gave away 20 -- what you're saying is there's 10 guns, as I

15 understand it, no more than 15. And, you know, so if it's 10

16 guns, that leaves 25 that he got from Lawmen's that he didn't

17 have in his possession anymore, right, more or less? And the

18 lowest amount I saw that these guns were bought for was $400.

19 That's $10,000 out of his pocket to buy the guns, and he

20 doesn't have the guns anymore.

21         So I don't understand why there isn't an inference

22 that he sold at least some of those, because that's a lot of

23 money. I think it's a lot of money.

24         **MR. DOWLING:** I think it's fine to draw the inference

25 that he sold them. I think that it's also fair to say that he

US v. Timothy Norman  -- Sentencing -- 6/2/22

Case 1:21-cr-00373-CCE   Document 67   Filed 06/23/22   Page 25 of 81

traded or gave some away.  All of those behaviors, selling

without a profit motive, the gifting, like I said -- I think I

belabored the point enough.  I don't want to burden the Court

with rehashing it, but I do think that it's protected by the

statute defining the offense of conviction, or at least

excluded from the ambit of conduct that Congress sought to

criminalize.

I would just like to say for the record that to the

extent that Mr. Norman was found with cash in his car, he

did -- he still does own a lawn mowing business.  I believe

many of his customers are here in the courtroom today.  I mean,

this is a cash business.  I know that sounds very convenient

for someone who has pled guilty to this crime because that's a

cash business as well, but I would just say that I don't think

it's entirely fair to just automatically assume that that was

tied to the business.

If the Court -- if I may, I would like to turn to the

abuse of trust enhancement.

So it's our understanding that the Government has

identified three species of conduct that it believes triggered

this enhancement.  Now, we don't think any of the three do

because none of them satisfy -- none of the conduct satisfies

the second prong of the two-prong test that the Fourth Circuit

requires us to look at.

So, as the Court is aware, this two-prong test

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  under -- well, I will cite the case for the record, *United*
2  *States v. Brack* at 651 F.3d 388, Fourth Circuit, 2011.  So
3  first is the status prong.  It requires the Government to show
4  that Mr. Norman occupied a position of public trust.  Now, we
5  don't dispute that.  We agree that he did.
6          But the second prong, the one with which we take
7  issue, is that this is the conduct prong where the Government
8  has to show that Mr. Norman -- that the -- he abused his
9  position of trust in a manner that significantly facilitated
10 the commission or concealment of the offense.
11         Now, again, you know, words matter.  We're drilling
12 down on the text of this guideline and the application note.
13 This does not say his conduct could have facilitated the
14 commission, was likely to, had the potential to.  I will just
15 quote briefly before I tie it up with the facts:  "For the
16 enhancement to apply, the position of public trust must have
17 contributed in some significant way to facilitating the
18 commission or concealment of the offense."
19         So the Government starts with the fact that
20 Mr. Norman sold the firearm to the informant out of the back of
21 the patrol car.  Now, really what the Government's argument
22 there is is that if a police officer had passed by and if a
23 police officer had seen the interaction between Mr. Norman and
24 the informant, the officer would have been less likely to
25 intervene or engage, so this somehow concealed the crime.  But

US v. Timothy Norman  -- Sentencing -- 6/2/22

1   in this case there's no allegation that anybody passed by -- or

2   a police officer passed by.  So, at best, this is really a

3   situation where this had the potential to conceal the crime.

4           There is also the argument that, you know, police

5   officers would be more likely to pull over and say, hey, to

6   their colleague, how are you doing?  What's going on?  So we

7   don't think that that really pushes the conduct across the

8   threshold to get the Government to where this conduct actually

9   significantly facilitated the concealment.

10          A similar argument with respect to accessing CJLEADS,

11  the law enforcement database.  So the Government concedes that

12  when Mr. Norman looked up the license plate and the name of the

13  informant, he was unsuccessful; it yielded no fruit.  So now

14  this -- so what happened with the informant is that Mr. Norman

15  looked up his name, found nothing, no criminal record, no

16  prohibition under state or federal law that this person was

17  prohibited.  So in Mr. Norman's view, he was selling to

18  somebody who was a lawful purchaser and possessor of a firearm.

19          **THE COURT:**  Can you direct my attention to where this

20  is in the presentence report -- I apologize -- just so I can be

21  looking at while you're talking?  I remember reading it.

22          **MS. McFADDEN:**  Paragraph 34, Your Honor.

23          **THE COURT:**  Paragraph 34.

24          **MR. DOWLING:**  That's right.  At the last -- so it

25  would be on page 13 of the PSR.  The last sentence of paragraph

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  34: "Timothy Norman admitted he attempted to identify the

2  confidential source by running his or her license" --

3      **THE COURT:**  That's what I thought I remembered.  He

4  didn't actually run his name.  He ran the license plate.

5      **MR. DOWLING:**  I was under the impression, based on

6  the representations the Government made in its most recent

7  filing, that Mr. Norman also ran the name, but I think --

8  either way, I think it didn't yield anything that really

9  affected the outcome of anything.  He didn't find anything

10  that --

11      **THE COURT:**  They certainly agreed with you about

12  that, that he didn't find -- that he didn't find anything.

13      **MR. DOWLING:**  That's right.

14      And, now, to the extent -- you know what, I think

15  I'll skip that because that's not in the PSR.

16      So, now, this is important.  I mean, if the

17  informant's identity was not masked or if his license plate did

18  yield some sort of problem and Mr. Norman had said, okay, we

19  need to go to a more clandestine location or the deal is off,

20  then I think that -- you have better -- the Government would

21  have a very good argument there then that that would --

22      **THE COURT:**  I mean, I was under impression he only

23  knew the -- I mean, obviously, he didn't know it was an

24  informant.  I mean, he was just selling to some guy out there

25  in the universe.  He only knows his first name.  That's what I

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  thought he knew.  Is that not right?

2          MS. McFADDEN:  That's correct, Your Honor.

3          THE COURT:  I mean, is that not right?  Is there

4  anything to the contrary?

5          MR. DOWLING:  No, I think that's consistent with what

6  we've seen.

7          THE COURT:  All right.  Go ahead.

8          MR. DOWLING:  And so then -- I will just repeat what

9  I was saying.  I think that if he had found something that was

10 problematic and then he had said to the informant, all right,

11 we've got to go to a more clandestine location, we've got to do

12 it at night or I'm going to call off the deal entirely, then

13 that would have facilitated the concealment of the offense.

14 But I don't think that just running the search and having it

15 yield no information -- I don't think that that really pushes

16 the conduct over the threshold.

17          I will just quote one more time from the operative

18 language of the application note:  "For this enhancement to

19 apply, the position of public trust must have contributed in

20 some significant way."  I don't think running the search really

21 had a significant contribution to anything.

22          And then as for the purchases at Lawmen's, I think

23 that the Court -- I'm not sure if the Court would like to

24 change the language from before.  I think the draft amended

25 language that we're using now is that Lawmen's has a

           US v. Timothy Norman  -- Sentencing -- 6/2/22

1  self-limited clientele, including nonsworn first responders.  I

2  think that we'd primarily rest on our briefs -- or our

3  sentencing brief with respect to that issue.  I don't think

4  that applying the abuse of trust enhancement here is -- I think

5  it would fall really outside the heartland of cases where you

6  apply this.

7        I mean, typically -- I think I've looked at every

8  single reported case out of the Fourth Circuit on the abuse of

9  trust enhancement for like the last 25 years.  Granted, most of

10 them are in the context of financial transactions,

11 embezzlement, bank employee, nonprofit chairpersons, and it's

12 really -- the situation is almost always characterized by a

13 lack of supervision, a substantial deference, basically a

14 hard-to-detect crime.  And I don't think that that really is

15 consistent with buying from Lawmen's.

16        I do understand the Government's argument.  It has

17 surface appeal.  You know, you think -- the place, after all,

18 is called Lawmen's.  You have a police officer.  You think

19 about that.  You think guns.  You think guns.  You think police

20 officer.  But really that's just one of a larger subset of who

21 they sell to, and I don't really think it's fair to amplify

22 Mr. Norman's sentencing exposure because he happened to be one

23 of the people who could buy from Lawmen's.

24        So if the Court does not apply either of these

25 enhancements, it's our position that the correct adjusted

US v. Timothy Norman  -- Sentencing -- 6/2/22

offense level should be 17 with an advisory range of 24 to 34 months.

　　　　If the Court doesn't have any further questions, then I suppose I will hand it over to Mr. Howard.

　　　　**THE COURT:**  All right.  You're the only one speaking to the objections; right?

　　　　**MR. DOWLING:**  That is correct.

　　　　**THE COURT:**  All right.  Government have any rebuttal?

　　　　**MS. McFADDEN:**  No, Your Honor.

　　　　**THE COURT:**  All right.  The Court will amend the presentence report, paragraph 34, the fourth sentence, where the phrase begins "Lawmen's" to say, "Lawmen's, who only sells to a self-limited clientele of current and former law enforcement and nonsworn first responders."  So I will add that in just so it's clear it's not only law enforcement officers.

　　　　And I will add a sentence to the end of the paragraph:  "Family and friends confirmed to law enforcement that the Defendant gave them guns."

　　　　Now, otherwise, I will adopt the findings of fact in the report as my own.

　　　　As to the guidelines calculation, the Court will adopt them as suggested by the probation officer.  It seems to me a fair inference that there more than 24 guns.  I don't know -- I don't think that he possessed all of those 86 guns for sale.  The evidence is persuasive that he was a collector

US v. Timothy Norman  -- Sentencing -- 6/2/22

1 and had a lot of guns, but the evidence is quite strong that he

2 offered many of these guns for sale. Mr. Hudson said he had

3 many firearms that he got from Mr. Norman, and the informant

4 had seen a lot of these guns. We've got these photos. You

5 know, you've got what I consider to be just a large number of

6 purchases, and he doesn't have the guns anymore. And we know

7 he's in the business because of the undisputed evidence about

8 selling to the two other folks here, Mr. Hudson and the

9 informant.

10       So when I put all of that together, it seems to me

11 that the number of guns is more than 24. I don't think it's

12 86, but I don't think that I have to find the specific number

13 or identify gun by gun to say, you know, this was a pretty

14 large-scale business offering more than 24 guns for sale. That

15 seems sufficient to me to apply the enhancement and appropriate

16 to apply the enhancement.

17       I'll also find the plus-two for abuse of trust. I

18 think when I look at all the facts and circumstances together,

19 just like with the gun enhancement, you know, each little bitty

20 piece, okay, well, maybe not sufficient; but when you put it

21 all together, you definitely have an abuse of trust.

22       He was buying these guns from a place that had a very

23 limited clientele. He was able to buy guns there because of

24 his job. The product he was buying had these, you know,

25 markings indicating law enforcement connections, which, when

US v. Timothy Norman  —— Sentencing —— 6/2/22

1  you put that with it, it certainly contributes.

2         And then you have the other behavior, which I agree

3  with the Government -- with the Defendant, by itself, the fact

4  that he one time is selling guns out of his highway patrol car

5  in uniform, well, okay, maybe that's not enough; but when you

6  add that with the other facts and the fact that he did use this

7  Government database for this unlawful purpose -- you know,

8  whether it was successful or not, whatever his hope was, he

9  didn't find out what he wanted to know.  I don't know what he

10 exactly he wanted to know, but he didn't find out anything from

11 it, but he did do it; he did use it for that personal purpose

12 rather than for any authorized purpose.  It clearly was

13 connected to the offense.

14        So when I put all of those factors together, the

15 abuse of trust enhancement is appropriate.

16        Based on that, the total offense level is 21.  His

17 criminal history category is I.  The guideline range is 37 to

18 46 months.  The supervised release range is 1 to 3 years.  The

19 fine range is 10,000 to $100,000.  I will take all of that into

20 account on an advisory basis.

21        Probation is suggesting a downward variance to a

22 24-month sentence and a 1 fine with a year on supervised

23 release.  I think the Government is asking for a

24 within-guideline sentence and a 50,000-dollar fine.  And I

25 can't remember what you suggested about supervised release,

US v. Timothy Norman  -- Sentencing -- 6/2/22

1   Ms. McFadden, so if you will address that when you speak.

2           And then I took it that the Defendant was asking for

3   a sentence around what Probation has suggested; and if you

4   addressed the length of supervised release or the fine, I don't

5   remember.  So I will ask you to address those things as well

6   just to remind me.

7           You all will address the mandatory drug testing term

8   of supervised release.  And I'm not trying to limit your

9   argument to me at all, but I just -- some of the letters from

10  the family members and friends and employers and such -- you

11  know, I appreciate what they're saying, but they -- many of

12  them, not all of them, many of them are clearly downplaying the

13  seriousness of the offense.  Several of them actually said he

14  didn't do anything wrong, or words to that effect, which is

15  concerning because why would they think that if Mr. Norman was

16  not saying that to them?

17          Maybe they're just -- maybe they just think it

18  because they don't want to believe it.  Certainly there was

19  some of that going on in the letters too.  But, you know, it

20  does always concern me when people support the Defendant in a

21  way that indicates he might not have really been forthcoming

22  with them, and there were so many of these that did that.  I

23  was a little concerned about that.

24          I wasn't sure I really understood your Second

25  Amendment argument to the extent that plays into the 3553(a)

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  factors.  Maybe it doesn't, but if it does, if you could

2  explain that to me further.

3          And if the Government could address the effect of the

4  extended period of home confinement and whether -- how I ought

5  to take that into account in evaluating a sentence.  You know,

6  people do sometimes argue, as Mr. Norman has -- he spent a long

7  time on very restricted home confinement.  For a long time he

8  couldn't leave at all, and then he's only been able to leave to

9  work more recently.  People say, well, you ought to come off of

10 the active sentence because of that.  And I understand that to

11 be one of the Defendant's arguments.  So if the Government

12 could address their view on how I ought to think about that,

13 that would be good.

14          All right.  For the Defendant?

15          Well, does anybody have any additional evidence?

16          **MS. McFADDEN:**  No, Your Honor.

17          **MR. HOWARD:**  No, Your Honor.

18          **THE COURT:**  All right.  Go ahead.

19          **MR. HOWARD:**  Your Honor, as a housekeeping matter, I

20 just want to be clear with regard to something we discussed

21 with Ms. Thompson before the hearing and the fine range.

22          Is there an amendment we need to make there?

23          **THE PROBATION OFFICER:**  Your Honor, on the

24 justification, page 1, that is a typographical error.

25          **THE COURT:**  Oh, thank you.  That's where I was

Case 1:21-cr-00373-CCE   Document 67   Filed 06/23/22   Page 36 of 81

1  looking.

2      **THE PROBATION OFFICER:**  Page 117 is correct.  The

3  fine range should be 15,000 to $150,000.

4      **THE COURT:**  Thank you, Mr. Howard.  15,000 to

5  150,000.  I sometimes look at that summary sheet and rely on

6  it.  I'm sorry.  I apologize.

7      My computer is not cooperating with me.

8      Okay.  Go ahead.

9      **MR. HOWARD:**  Thank you, Your Honor.

10     Your Honor, I got my start in this courthouse as a

11 lawyer one floor down so many years ago that I think

12 Ms. Winchester remembers when I was skinny.  And since then, at

13 least one thing has gotten better.  You see, back then the

14 guideline calculations you've just made were mandatory after

15 that, and we would have a very cramped and confined analysis

16 and set of arguments for you.

17     Fortunately, the law has changed there.  The

18 discretion to find the right place for the resolution of the

19 case is up to you.  We haven't gone into great length about

20 *Rita* and *Kimbrough* and *Gall*.  You're well aware of your

21 discretion under 3553.

22     **THE COURT:**  I am.

23     **MR. HOWARD:**  So our arguments as to 3553 track the

24 statute in its order.  Section (a)(1) requires you to consider

25 the history and characteristics of the person at hand.

US v. Timothy Norman  -- Sentencing -- 6/2/22

1          This failure does not define Tim.  As the Court

2    mentioned a moment ago and wants us to respond to, some of the

3    letters suggest that maybe they -- you know, he doesn't get it

4    or they don't get it.  I don't think that's -- it's coming from

5    him communicating that he didn't do anything wrong to them.

6          What these folks understand is in the broad context

7    of this 48-year-old man, who came from very humble beginnings

8    and had done, other than this, a salutary life and had done

9    very well for himself and his family -- in that big context,

10   this to them should not define Tim and that he is unlike so

11   many of the other defendants we see in here day in and day out;

12   otherwise, a wildly successful and admirable person.  He's just

13   messed up this one thing in the course of an otherwise salutary

14   life dedicated to his faith and to his family and to his

15   community.

16          Your Honor, very often as a defense lawyer you have

17   to kind of stitch together a quilt of a few jobs here and there

18   in the course of a defendant's life.  Tim doesn't present work

19   history.  He presents a work guarantee.  You know, he's been

20   working since he was 14 years old.  He would -- when he was in

21   patrol school, as the oldest member of his class, he would work

22   at night.  He works and has maintained his lawn care business

23   while a highway patrolman and has gone back to that now, and

24   the only way -- the only reason he hasn't taken any number of

25   other long-term contracts with that right now is because of the

US v. Timothy Norman  -- Sentencing -- 6/2/22

1 uncertainty of what will happen here today.  Tim's work history

2 is remarkable, and as soon as he can get back to that, that's

3 what he will do all day, every day.

4        The letters, which are greater in number than any

5 other case I have ever submitted, are supported also by what

6 looks to me as an almost entirely full courtroom.

7        **THE COURT:**  A lot of people.

8     (Applause from gallery.)

9        **THE COURT:**  Excuse me.  Please do not do that.  I

10 will have you removed from the courtroom if you disrupt the

11 proceedings.  No applause.

12        Go ahead.

13        **MR. HOWARD:**  Ultimately, as to history and

14 characteristics of the person, the greatest evidence and

15 testament to that as to Tim Norman are all the letters before

16 you and all the folks behind me, row after row of people who

17 have made a collective judgment as to Tim and came here to

18 support him today and signal that to you.  That should be a

19 factor that's very much in his favor and supports our argument

20 for probation.

21        Section (a)(2)(A) [sic] calls for you to consider

22 deterrence.  This matter has already received substantial media

23 attention.  It was well known within Tim's former law

24 enforcement community.

25        Put simply, Your Honor, the zeitgeist of the relevant

    US v. Timothy Norman  -- Sentencing -- 6/2/22

1   community to be deterred is not so discerning as to make a

2   distinction between probation or a year and a day or the

3   sentence recommended by Probation or the full sentence

4   recommended by the Government.  The felony, the loss of his

5   career, the loss of his credentials as a highway patrolman is

6   more than enough to serve the deterrent factor that Section

7   (a)(2)(A) [sic] mandates you consider.  Really, Your Honor, if

8   you want to communicate deterrence, get him back out in the

9   community where he used to have a patrol car and used to have a

10  badge and used to have a uniform, and now he no longer does.

11  Hiding him in a prison actually countermands the deterrence

12  goal.

13          Your Honor, Section (a)(2)(C) requires you to

14  consider protecting the public from further crimes.  That was

15  actually Tim's job for ten years, every day, all day, pulling

16  over drunk drivers and speeders and helping people on the

17  highways.

18          His only failure was with his handling of his gun

19  collection, and now he will never have that again, and now he

20  will never get guns again.  You would be very hard-pressed to

21  find any rationale for concern about protecting the public from

22  further crimes.  Again, Your Honor, the best evidence of the

23  public's concern with Tim is sitting behind me, row after row

24  of people who knew him well and have no such concern as to Tim.

25          Finally, Your Honor, and most importantly, Section

US v. Timothy Norman  -- Sentencing -- 6/2/22

1    3553 requires you also to consider unwarranted sentencing

2    disparities.  We don't have the outcome of Mr. Hudson's

3    sentencing before Judge Tilley yet.  We do know that another

4    trooper was involved.  He's named in the presentence report.

5    He's still walking the streets in uniform.  That's a

6    significant disparity.

7            And, Your Honor, our chart goes through -- that's

8    appended to our sentencing brief.

9            **THE COURT:**  I missed that.  Can you direct my

10   attention?

11           **MR. HOWARD:**  Yes, Your Honor.  He's named in a

12   footnote on page 11, Footnote 4, which relates to paragraph 26,

13   Your Honor.

14           **THE COURT:**  Oh, I see it.  Okay.  Right.  Thank you.

15   I remember now.  I appreciate that.

16           Go ahead.

17           **MR. HOWARD:**  So, Your Honor, that individual presents

18   a significant disparity in how his case has been handled, but,

19   most importantly, the chart of similar cases from across the

20   country that we have included in our sentencing brief proves an

21   important point.

22           And I know the Government, in its response, pointed

23   out that you just -- you can't get a lot of granular detail as

24   to who among the defendants on that chart, you know, was a cop

25   or how many guns did they sell or what prior history did they

         US v. Timothy Norman  -- Sentencing -- 6/2/22

1    have.  That's not the point.  In a post-guideline --

2    post-mandatory guidelines era, it's the gestalten, which is

3    that it shows courts across the country time and again are

4    uncomfortable with these ranges as applied to defendants like

5    Tim and then substantially downward vary.  We think that's also

6    appropriate here.  We appreciate that Probation thought that

7    was appropriate here and agreed that a very substantial

8    downward variance is necessary.

9            Your charge ultimately, Your Honor, under Section

10   3553 is to assess the whole situation.  And you asked about our

11   Second Amendment argument in our brief.  Ultimately, that ties

12   to our collateral consequences argument.  Tim suffers

13   significant -- or has suffered significant collateral

14   consequences.

15           He -- many of us -- we all have Second Amendment

16   rights.  Many of us don't exercise them at all.  That was his

17   favorite thing to do, and it has been since he was a boy.  He's

18   been collecting guns and hunting since he was a child.  He has

19   been raising his children to hunt.  All of his children have

20   lifetime hunting and fishing licenses.  The exercise of his

21   Second Amendment rights is a thing of great value to him, and

22   he will never be able to do that again.  That's a significant

23   collateral consequence, and that's the reason we made that

24   argument that you asked about.

25           He also lost his dream job, the one he fought through

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  years of back injury and pain as the oldest person in his

2  highway patrol class.  He lost whatever progress -- ten years

3  of progress towards his pension.  He has had no income through

4  the pendency of this case, almost basically a year.

5          He had nine months on house arrest, and everything

6  you can see in the presentence report, everything we submitted

7  shows he's normally out and about, whether he is on the roads

8  as a highway patrolman or he's mowing lawns in his lawn care

9  business or he is out in the field hunting.  Confining that man

10 to his house is confining him the same as prison effectively,

11 except that he can at least help out around the house to a

12 limited extent.

13         He didn't get his ankle bracelet off until last week.

14         **THE COURT:**  He didn't what?

15         **MR. HOWARD:**  He didn't get his ankle bracelet off

16 until the last week or two.  So those nine months, Your Honor,

17 we would suggest need to factor in very heavily into reducing

18 the otherwise -- the outcome you would otherwise reach.

19         Your Honor, we would also like to point out a very

20 important fact.  A cop in prison serves time a lot harder than

21 anybody else in prison.  He is not going to be popular there.

22 There is no reason to send him there if -- because I suspect

23 that BOP, in their opaque rationales and reasoning that

24 sometimes frustrate all of us, will recognize that because this

25 is a gun case, he will be assigned to a higher level of

US v. Timothy Norman  -- Sentencing -- 6/2/22

1 security than he would otherwise get.  A cop in medium security

2 is going to have a real hard time.

3        We're in an age where violent repeat offenders can

4 petition this Court for early release because of COVID, because

5 it threatens their life.

6        **THE COURT:**  They usually don't get it just for that.

7        **MR. HOWARD:**  A cop in prison is facing similar

8 life-threatening issues.  He will have a very hard time in any

9 kind of incarceration situation.

10        Ultimately, Your Honor, incarceration of Tim would

11 simply bring more destruction to everyone in the case.  It does

12 not serve as any additional deterrent than we've already

13 achieved.  It's not necessary to protect the public.  It would

14 defy the nature and history and characteristics that these

15 folks stand in living, breathing testament to.

16        We suggest to this Court that the probation office's

17 recommended variation -- or recommended downward variance is

18 well reasoned, and we think you should go even further, down to

19 a probationary sentence, which recognizes the time he's already

20 spent on house arrest and the Section 3553 factors.

21        To be very specifically and technically clear, I call

22 it "probation" because that's the colloquial term.  Because he

23 spent a week in the lockup prior to his release, I suspect that

24 what we'll really -- it would need to be written in the

25 judgment as time served and a period of supervised release.

        US v. Timothy Norman  -- Sentencing -- 6/2/22

```
 1              THE COURT:  And what about a fine?
 2              MR. HOWARD:  Your Honor, the Government has asked for
 3  a substantial fine because Mr. Norman's wife has inherited
 4  money.  She has assets.  I have no visibility into those
 5  either.
 6              THE COURT:  You what?
 7              MR. HOWARD:  She has assets.
 8              THE COURT:  I just didn't hear what you said after
 9  that.
10              MR. HOWARD:  And I have no visibility into those
11  either.
12              THE COURT:  You have no what?  Visibility?
13              MR. HOWARD:  Visibility.
14              THE COURT:  Okay.
15              MR. HOWARD:  Neither does Tim.  That is not Tim's
16  money.  Under state law, when a spouse inherits funds, as she
17  did, it's her -- those are her funds.
18              THE COURT:  I appreciate that argument.  But if you
19  can address it just looking at -- let me see.  Paragraph --
20  this thing is so long.  I guess it's actually on page 29.  It's
21  within paragraph 105.  But if you look on the next page where
22  105 carries over, you've got the net worth figure, and that
23  does not take into account any of his wife's assets and does
24  indicate an ability to pay a fine even without consideration of
25  his wife's assets; right?
```

US v. Timothy Norman  -- Sentencing -- 6/2/22

1          **MR. HOWARD:**  We don't mean to say that he can't pay a

2   fine or should not.  We mean to say that the guideline fine is

3   appropriate and not the enhanced number the Government has

4   recommended.

5          **THE COURT:**  The minimum guideline?

6          **MR. HOWARD:**  Yes, Your Honor.  And part of the reason

7   for that is he will lose his economic interest in nearly all

8   these firearms, which is tens of thousands of dollars.  He's

9   also lost his income for the last year or so.  He's lost --

10         **THE COURT:**  There's no forfeiture of them.

11         **MR. HOWARD:**  Ultimately, Ms. McFadden and I have been

12  discussing the disposition of the seized guns.  Some of those

13  certainly preceded and had nothing to do with the offense, and

14  we will work through that in time, but he ain't getting them

15  back.

16         **THE COURT:**  Okay.

17         **MR. HOWARD:**  And that's an immense value.  Firearms

18  for some people are the equivalent of investment devices, and

19  for him it is a thing of significant value.

20         He's also lost his income.  He lost a lot of the

21  extra revenue he earned from the mowing business during home

22  incarceration.  So he's already been very substantially

23  economically punished.

24         **THE COURT:**  Okay.  For the Government?

25         **MS. McFADDEN:**  Thank you, Your Honor.

       US v. Timothy Norman  -- Sentencing -- 6/2/22

        The Court has found here that the abuse of trust
enhancement applies.  What occurs to me is that throughout the
number of cases that I handle where that particular enhancement
applies, there seems to be a through-line, not 100 percent of
the time, but a fair portion of the time, which is that an
individual has reckoned with the consequences of the conduct,
what's going to happen as a part of being a part of the
criminal justice system, what punishments are available for the
Court to impose, but has not necessarily wrestled with conduct;
so we understand the consequences, but not the conduct.

        And that's what I see in this PSR, and that's what I
see in these letters.  There is an overarching theme of
victimhood.

        Mr. Howard has done a wonderful, wonderful job
advocating for his client, but it was not lost on me that when
he was speaking to the Court about what an appropriate sentence
was, there was the repetition of the things that Mr. Norman had
lost.  He has lost this.  He lost this.  But what I think that
does is it takes the focus away from what the conduct was as to
why these are now the consequences that Mr. Norman is facing.

        And you also see that same through-line in the
probation officer's observation that he does not seem to
recognize the illegality of his actions, which could lead to an
increased risk of recidivism.  I think here it's not just the
specific deterrence issue that's highlighted by the recidivism

aspect.  There is also the promotion of the respect for the
law, which is that firearms are regulated in this country
because they are the most easily accessible and impactful way
to kill a lot of people.

And there's no suggestion that the firearms involved
in this particular case met that consequence or were found in
any crime scene.  I'm not saying that.  What I'm saying is that
there needs to be a recognition that this is very serious
conduct, and that here, specifically in terms of the sales that
happened here, we're not just talking about to friends and
family.  We're talking about someone that Mr. Norman knew to be
a volatile drug addict who had stabbed someone.  Now, I would
submit to the Court that the evidence in the PSR supports that
he also knew that he was a convicted felon.  That's not the
crime that he pled to, and I understand that, but at the very
least that he was not a responsible person.  He sold them to
someone whose identifying information he knew absolutely
nothing about.  He knew his first name.

And these are transactions that happened in short
succession.  There's obviously an appetite for these sales, and
there is a markup for these sales.  I mean, as the PSR
documents, there is a 410-dollar gun sold for $1,600, and a 410
gun sold for $2,000.  That's in paragraph 48 of the PSR.  And
when asked about these price hikes, when the agents interviewed
him on the date of arrest, he described it as being a, quote,

1  used car salesman.  That's paragraph 37.

2          There's a cavalier attitude to this type of conduct

3  that is here in the PSR, where the conduct is described, and I

4  think in the reckoning, what is going to happen now related to

5  that?  Even in the letters that Your Honor noted, there is

6  references to Mr. Norman trusting the wrong person, putting

7  others first to a fault, catch-22 decision about a plea

8  agreement.  I mean, all of this is painting the picture of

9  someone who just stumbled into bad fortune, someone that the

10 big, bad government is out to get.

11         What happened here was that what Mr. Norman made

12 these choices.  He made the choices to sell these firearms in

13 the way that he sold them and to the people that he sold them,

14 and he, as a law enforcement officer, was in a unique position

15 to know what the disastrous consequences of that could be.  I

16 mean, the PSR documents that he indicated he was shot during

17 his job.  That's paragraph 89.

18         So they are going into the hands of these people --

19         **THE COURT:**  Slow down.  What?

20         **MS. McFADDEN:**  They are going into the hands of

21 people where we don't know what's going to happen to them.

22         I don't need to belabor the point here in terms of

23 the nature and circumstances of the offense, but paragraph 110

24 of the PSR notes the benefit of the plea agreement.  And the

25 other two counts that Mr. Norman was charged with related to

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  that transfer to a prohibited person -- that would have been

2  Mr. Hudson -- his guidelines range, had that been the count of

3  conviction, even with acceptance, would have been 87 to 108

4  months.  That is a staggering sentence for someone who has no

5  criminal history and has done no significant time.

6          I don't think that's an appropriate sentence.  I

7  think the appropriate sentence is the one that we've requested,

8  which is within the guideline range and, as the Court found

9  here, would actually be one month below that.  But it's because

10 the guidelines capture the salient 3553(a) factors in this

11 case.  The guidelines capture the severity of the conduct.  The

12 guidelines capture the need to promote respect for the law.

13 The guidelines capture the need for specific deterrence as it

14 relates to Mr. Norman arising from concerns, again, that he

15 doesn't necessarily understand the illegality of it, but also

16 the motivation in doing it.

17          As I noted in my position paper, this is not someone

18 who's, you know, struggling to feed eight children paycheck to

19 paycheck, no job, anything like that.  This appears to be just

20 to make a side buck or two with great risk in terms of the

21 conduct.  It just doesn't make sense.  When you look at it from

22 that perspective, you need a guideline sentence to specifically

23 deter that type of behavior happening again if you don't

24 understand why it happened and you don't understand why it was

25 wrong.

US v. Timothy Norman  -- Sentencing -- 6/2/22

1    As to the arguments that the conviction itself, the
2 prosecution itself, the loss of Second Amendment rights somehow
3 merit a different sentence out of the guidelines range, I just
4 don't think that's the case here.  This Court sees every single
5 day people who have families that love them, people who have
6 made positive contributions to society, people who have a lot
7 to lose to be separated from that family.  And I know the Court
8 does not take those decisions lightly, and I know that we do
9 not take them lightly either.  We understand the collateral
10 consequences of a custodial sentence, but there's nothing here
11 that makes this an outlier.  His criminal history category is
12 accounted for.  The circumstances of the offense are accounted
13 for.  The guidelines take all of that into account.
14    So, for those reasons, I don't think that the
15 additional press or the loss of the hunting trips should rule
16 the day here in terms of what's appropriate because this
17 sentence also needs to promote respect for the law and
18 generally deter others that would think, you know, because I
19 had this badge and I have this family that supports me, you
20 know, the law applies differently to me; I'm not going to have
21 to face the same consequences as somebody else who maybe didn't
22 have those particular advantages.
23    In terms of supervised release, Your Honor, I would
24 ask just to speak to the length of time.  I apologize for not
25 having done that in my position paper.  I actually think three

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  years is appropriate.  Obviously, as the Court knows,
2  individuals who have served a certain amount of time of their
3  supervised release could always come back to the Court, you
4  know, certificate of good behavior, Probation's agreement, and
5  get off of supervised release.  I think, as a starting point,
6  it's appropriate.

7           I have concerns, in reviewing the presentence report,
8  about some of the minimization of the conduct as it relates to
9  Mr. Norman and his support network.  I have concerns about
10 complete and total transparency with Probation on certain
11 issues.  I think when those issues present themselves, that
12 starting out with the three-year term is appropriate with the
13 opportunity to obviously terminate earlier if that's the case.

14          I think that Your Honor's point about the mandatory
15 drug testing is well taken.  Again, obviously, these are things
16 that can be revisited should Mr. Norman perform well on
17 supervised release, which would certainly be our hope.

18          In terms of home confinement, I also understand Your
19 Honor's point as to that.  Obviously, individuals who have been
20 in custody would get credit for time served.  The distinction
21 that I would draw here is that those individuals don't get to
22 hug their loved ones every night before they go to bed, see
23 them the first thing in the morning, you know, take in whatever
24 media and entertainment they would like whenever they would
25 like it, have the freedom to move about their house, move about

US v. Timothy Norman  -- Sentencing -- 6/2/22

1    their yard, electronic monitoring notwithstanding.

2            So to the extent the Court would consider that as a

3    time-served aspect, I would just ask that the Court not apply

4    the full amount of time, but lessen the amount of time the

5    Court would apply to take into account for the fact that it's

6    not quite the same as being in the county jail.

7            At the end of the day, I agree with Mr. Howard; no

8    one set of conduct defines him.  Obviously, Mr. Norman had a

9    lot going for him.  I think that's what makes this so

10   difficult, because there just doesn't seem to be a reason to

11   explain the behavior.  But, also, at the end of the day, this

12   is incredibly serious conduct.  It can have the worst

13   imaginable consequences.  This is a time where the sentence

14   needs to meet that moment, recognize the severity of the

15   conduct, recognize the risks, recognize the fact that we have

16   to be able to trust our sworn law enforcement officers to know

17   better.

18           So, for those reasons, I would ask the Court to

19   impose a sentence at the low end of the guidelines range.

20       (Pause in the proceedings.)

21           **THE COURT:**  All right.  Mr. Norman, would you stand.

22           If there's anything that you would like to tell me

23   before I make a decision in your case, I'm glad to hear from

24   you.  You do not have to speak.  I will not hold it against you

25   if there's nothing you want to add; but if there is anything

US v. Timothy Norman  -- Sentencing -- 6/2/22

1 you want to tell me, please go ahead.

2         **THE DEFENDANT:**  Yes, ma'am, Your Honor.

3         I am accepting responsibility.  I understand and I

4 teach my kids when there's actions, there's consequences.  If

5 you do something wrong, that's just -- there's consequences.

6 And I understand that.  I'm not asking for a

7 get-out-of-jail-free card.  I'm not asking to not be punished.

8 I agree that I have been punished.

9         And I understand -- I didn't realize at the time that

10 I was doing anything wrong.  I understand the seriousness of

11 it.  I understand guns.  I've been around guns my whole life,

12 and I know guns are a serious thing.

13         I never -- I respect the law a thousand percent.  I

14 would never do anything to upset the law or go against the law

15 or to put my family or job in jeopardy.

16         I grew up --

17         **THE COURT:**  Did you say you did not know you were

18 doing anything wrong?

19         **THE DEFENDANT:**  I didn't understand at the time -- I

20 would --

21         **THE COURT:**  Okay.

22         **THE DEFENDANT:**  I wouldn't break the law knowingly.

23 I made a mistake.  I understand that, and I accept

24 responsibility for that.

25         Again, like I said, I have been collecting guns my

US v. Timothy Norman  -- Sentencing -- 6/2/22

1   whole life.

2           THE COURT:  You've been what?  I'm sorry.

3           THE DEFENDANT:  I've been collecting guns my whole

4   life and been a gun enthusiast and hunting and so forth my

5   whole life.  That's why I take a lot of pictures of my guns,

6   and my family and friends that are here, they do the same

7   thing.  You take pictures of your guns because you -- it's like

8   a nice car -- a collector car.  You post-- you show your

9   friends or you post or whatever because you're proud of it.

10          I grew up from having nothing in a single-wide mobile

11  home.  I didn't even have a bedroom.  My parents split up when

12  I was seven.  I got married and had my first child in 1997.  My

13  daughter and --

14          THE COURT REPORTER:  I'm sorry?

15          THE COURT:  You need to slow down a little for the

16  court reporter.  I mean, I think I'm following most of you, but

17  I've read the presentence report.  If you can just slow down a

18  little bit about your children.

19          THE DEFENDANT:  Yes, ma'am.  Sorry.

20          THE COURT:  You got married and had your first child

21  in '97 and then another one in '99?

22          THE DEFENDANT:  Yes, ma'am, I got married --

23          THE COURT:  And I believe you've had custody of them

24  since --

25          THE DEFENDANT:  -- '96 and their mom walked out when

        US v. Timothy Norman  -- Sentencing -- 6/2/22

1 | they were 1 and 3, and they are in the courtroom now.  They are

2 | 23 and 25.  I had just had surgery when their mom walked out,

3 | so I was on crutches and taking care of my 1- and 3-year-old.

4 |        I met my wife now -- we've been together 19 years

5 | this June.  She come into picture when --

6 |        **THE COURT:**  She what?

7 |        **THE DEFENDANT:**  She come into the picture when they

8 | were 3 and 6, and she was good with the girls and did things

9 | with them.  They connected really good, so they were, I mean,

10 | good for each other.  And she understood that I had my

11 | daughters full time all the time.  Their mom didn't see them at

12 | all.

13 |        We got married in 2003, and we decided to have our

14 | own family as well.  So we had a son.  He's in the courtroom,

15 | and he's 15 years old now.  After that, we got pregnant while I

16 | was actually in patrol school in 2015 with our daughter Sophia.

17 | My wife gave birth to our daughter.  Of course, I saw her last

18 | -- we saw her last heartbeat.  There was nothing they could do,

19 | so we lost our daughter.  After that, we tried for several

20 | years to have another child because she wanted a daughter

21 | because --

22 |        **THE COURT:**  She what?

23 |        **THE DEFENDANT:**  She wanted her own daughter because

24 | she come into the picture when mine were --

25 |        **THE COURT:**  I just can't quite follow what you're

US v. Timothy Norman  -- Sentencing -- 6/2/22

1 saying there at the end. She wanted her own daughter?

2         **THE DEFENDANT:** Yes. My wife, when she come into the

3 picture, my daughters were 3 and 6. She wanted to have her own

4 daughter to raise and dress up. She did all that with my

5 daughters. But when we lost our daughter, it impacted our

6 lives greatly and impacted her. We tried for years to have

7 another child, and fertility just wasn't in our favor.

8         So in 2017, we had our second son, which is Landon.

9 He's 4 now. And then in 2000 -- I'm sorry. I get my years

10 mixed up with my kids. I've got so many kids. We have a

11 2-year-old now, Grayson. Since then, we still tried to have a

12 baby girl. It ain't worked out. It's in God's hands.

13         I've worked since I was 14 years old to succeed in

14 life. I've always worked 60 to 80 hours a week since I was out

15 of high school. I worked at UPS through high school, and

16 that's where I hurt my back. I've since had three back

17 surgeries and two shoulder surgeries. I have small fiber

18 neuropathy, which gives me chronic pain in my hands and feet

19 every day. I have back pain every day, obviously.

20         I grew up in church, in youth groups, and so forth.

21 I've never tried a drug in my life. I've never tried a drug in

22 my life. Of course, I've had pain medicine, but nothing I've

23 took on a normal basis. I'm not a drinker. I don't party. I

24 just work and spend time with my family. That's all I want to

25 do. I beg and plead that -- my 2- and 4-year-old will be

US v. Timothy Norman -- Sentencing -- 6/2/22

1 affected, like, tremendously if I leave the house.

2        I am remorseful, and I would never ever put myself in

3 a situation where I'm in front of you again.  I apologize for

4 putting you in a situation and have to -- to have to impose a

5 sentence or so forth on me.

6        And I'm sorry for my family for the embarrassment,

7 because it is an embarrassment to them, to me.  I feel like I

8 let a lot of people down, because my whole life -- I want to

9 help people.  That's why I got in law enforcement.  I've tried

10 to do good.  I try to see the people -- I try to see the good

11 in people.  I tried to mentor people and do what I can to help

12 them.

13        Again, Your Honor, I just want to be able to go home

14 to my family, take care of my kids, and help them raise -- my

15 15-year-old is getting ready to get his license.  I want to be

16 able to be there for him.  He's in high school now.  And I want

17 to work and provide for my family.  I've not been able to

18 provide for the last year for my family to help out with

19 doctor's appointments or school or day care, not even be able

20 to go to the store and get a gallon of milk for my kids.  I

21 just want to be there for my family, Your Honor.

22        **THE COURT:**  All right.  Thank you.  You can be

23 seated.

24        I will take a moment to look back over everything.

25        (Pause in the proceedings.)

US v. Timothy Norman  -- Sentencing -- 6/2/22

1      **THE COURT:**  Actually, let's just take a 10-minute

2  recess.

3      (Proceedings recessed at 10:59 a.m.)

4      (Proceedings called back to order at 11:11 a.m.)

5      (The Defendant was present.)

6      **THE COURT:**  Ms. Winchester, give one of those to each

7  side.

8      So before I proceed, Mr. Norman told me he did not

9  believe he was doing anything wrong.

10      I understand the elements of this offense to be that

11  a person engages in the business of dealing in firearms, not

12  being federally licensed, and acting willfully, which means

13  with knowledge his conduct was unlawful.

14      I feel sure -- I don't have a transcript, but I feel

15  sure I went over this with Mr. Norman when he pled guilty

16  because I have my handwritten notes, and I explicitly -- I

17  actually wrote in my own hand, "with knowledge that his conduct

18  was unlawful."  I am positive I went over that with him.

19      And I've handed you the front page of the Supreme

20  Court case -- I went back to double-check it -- from 1998, *U.S.*

21  *v. Bryan*.  For some reason I don't have the U.S. cite, but it's

22  118 S.Ct. 1939.  I didn't give you the whole opinion, but it

23  says that you don't have to know the exact specific statute

24  that you have violated, but you have to know that your conduct

25  was unlawful.

US v. Timothy Norman  -- Sentencing -- 6/2/22

1           So I'm going to give counsel a moment to consult with
2     Mr. Norman about this and the Government to think about this.

3           So I have some choices here.  I can withdraw my
4     acceptance of his guilty plea.  I can recalculate the
5     guidelines.  Perhaps there is something else I should do.  But,
6     you know, actually, I just find this shocking, and I confirmed
7     it with him.  He said it.  I repeated it.  I asked him.  He
8     repeated it.

9           So I'm open to hearing from you all, but I'm not just
10    going to ignore it like it didn't happen.  If you all will take
11    a moment.

12        (Defense Counsel conferred with the Defendant.)

13          **MR. HOWARD:**  May it please the Court, we would
14    propose a third option, which is to say Mr. Norman would like
15    to clarify his prior remarks and --

16          **THE COURT:**  His what?

17          **MR. HOWARD:**  Clarify his prior remarks or colloquy.

18          I would ask the Court when you consider that
19    opportunity to look at paragraph 96 of the presentence report.
20    The second to last sentence I think is important to
21    understanding his ability to communicate his state of mind at
22    the time and his knowledge of what he was doing.

23          And if you would, in light of paragraph 96, be
24    willing for him to speak to that again, it would be very
25    helpful.

        US v. Timothy Norman  -- Sentencing -- 6/2/22

```
 1              THE COURT:  What does the Government say?

 2              MS. McFADDEN:  I don't have an objection to any

 3   statements Mr. Norman wishes to make at this time; but in terms

 4   of how the Court proceeds, I would like the opportunity to be

 5   heard after that.

 6              THE COURT:  All right.

 7              Stand up, Mr. Norman.  What else did you want to tell

 8   me?

 9              THE DEFENDANT:  Yes, ma'am.  Your Honor, I understand

10   that I did wrong.  I do understand that.  I didn't understand

11   the laws at the time, but since all this come about, I

12   understand, and I understand that I did wrong.  And I am

13   greatly remorseful for that and apologetic for that.

14              THE COURT:  Okay.  At the time you sold these guns,

15   are you saying you did not think you were doing anything

16   illegal?

17              THE DEFENDANT:  I didn't understand the laws at that

18   time, ma'am.

19              THE COURT:  So --

20              THE DEFENDANT:  I never needed to sell guns for

21   money.  That's nothing that I've ever had to do.  I never had

22   to sell guns for money.  I don't even have to mow yards for

23   money.

24              THE COURT:  I'm sorry.  What?

25              THE DEFENDANT:  I don't even have to do my second
```

US v. Timothy Norman  -- Sentencing -- 6/2/22

1 lawn business.

2          THE COURT:  But you did it; right?  You sold the guns

3 for money; right?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  Did you or did not know that was illegal?

6 Whether you knew the specific law you were breaking or not, did

7 you know it was wrong to do that over and over again?

8          THE DEFENDANT:  I just didn't understand the laws on

9 that.

10         THE COURT:  Okay.

11         THE DEFENDANT:  I respect the law a thousand percent,

12 like I said.  That's why I did -- I respect the law.  I agree I

13 made poor judgment and made a mistake.  I agree with that

14 100 percent.

15         THE COURT:  You can be seated.

16         Mr. Howard, what -- I mean, as I understand it -- now

17 you correct me if I'm mistaken, because, you know, I don't -- I

18 act like I know at it all sometimes, but I don't.  But I

19 understand the law to be that at the time he did this, back

20 when he was selling these guns for money, he knew his conduct

21 was unlawful.

22         Is that an element of this offense?  I mean, is that

23 your understanding?

24         MR. HOWARD:  It is, Your Honor.  And, you know, as

25 the case you've handed out explains it, he didn't have to be

US v. Timothy Norman  -- Sentencing -- 6/2/22

1    aware of the particular licensing requirement.

2           You know, Tim's never going to be --

3           **THE COURT:**  Say again.

4           **MR. HOWARD:**  Tim is never going to be fully aware of

5    all the penumbras and emanations of NCF regulations and the

6    regulatory scheme.  In all of my interactions with him and

7    Mr. Dowling, as we discussed this case, he's very clear that he

8    knew what he was doing was inappropriate and unlawful.

9    That's --

10          **THE COURT:**  Well, he's not saying that to me today.

11          **MR. HOWARD:**  I think, in light of paragraph 96, the

12   Court can recognize that he would struggle to articulate that.

13          **THE COURT:**  All right.  What does the Government say?

14          **MS. McFADDEN:**  Your Honor, I'm not sure if I've quite

15   encountered this particular situation before.  I would agree

16   that the Court certainly went over that element at the Rule 11

17   proceeding.  My recollection is the same as the Court's.

18   Obviously, I don't think the statements today are consistent

19   with the representations that were made at the Rule 11

20   proceeding.

21          In normal circumstances, that would raise the issue

22   of the reduction for acceptance of responsibility certainly.  I

23   don't know how the Court would want to proceed in terms of the

24   guilty plea.

25          I would say that the reason why I credit what

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  Mr. Howard is saying in the sense of Mr. Norman's understanding

2  of things is that I believe, without getting too granular in

3  the weeds on the facts, that the evidence in the presentence

4  report, his statements, the way he went about this activity,

5  indicated he understand that it was unlawful.  However, that is

6  not what I heard communicated just now.

7          So we will proceed in whatever manner the Court

8  thinks is appropriate under those circumstances.  I'm happy to

9  answer any further questions, but that would be our position at

10 this point in time.

11         **THE COURT:**  Well, I don't have any doubt about there

12 being a factual basis for the guilty plea, even if he's denying

13 that he knew his conduct was illegal.  Certainly the facts

14 overwhelmingly, taken all together, show that.

15         Mr. Howard, does he want to withdraw his guilty plea?

16 I mean, I want to be sure he understands what he has pled

17 guilty to.

18         **MR. HOWARD:**  Your Honor, I would need just a few

19 minutes separately with him in the conference room across the

20 hall to make that momentous decision.

21         **THE COURT:**  I mean, I'm not saying I'd let him do it.

22 It is -- he cannot -- if a jury does not find or he does not

23 admit that he knew it was unlawful, then we're talking about an

24 *Alford* plea, which has -- and the Government has not agreed to

25 that.  A no contest plea the Government has not agreed to.  And

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  I have not agreed to it, either of those.

2           And if he's not admitting it, then I just need to

3  evaluate whether it's even appropriate to go forward with

4  sentencing him on that, whatever his views are on it.

5           All right.  We'll take a 30-minute recess for defense

6  counsel to consult with the Defendant.

7       (Proceedings recessed at 11:23 a.m.)

8       (Proceedings called to order at 11:52 a.m.)

9       (The Defendant was present.)

10          **THE COURT:**  Okay.  Where are we, Mr. Howard?

11          **MR. HOWARD:**  Your Honor, we are not interested in

12  pursuing withdrawal of the plea.

13          **THE COURT:**  Okay.  Stand up, Mr. Norman.

14          Is that right?

15          **THE DEFENDANT:**  Yes, ma'am.

16          **THE COURT:**  You still want to stick with your plea of

17  guilty?

18          **THE DEFENDANT:**  Yes, ma'am.

19          **THE COURT:**  You understand that it is an element of

20  this offense that at the time you engaged in the business of

21  dealing in firearms, you acted willfully with knowledge your

22  conduct was unlawful?  That is an element of the offense, and

23  if you had pled not guilty and gone to trial, the Government

24  would have to prove that beyond a reasonable doubt.

25          **THE DEFENDANT:**  Yes, ma'am.  I'm just nervous, and

        US v. Timothy Norman  -- Sentencing -- 6/2/22

1  it's just hard for me to get things out.

2          **THE COURT:**  I just want to be sure you understand

3  what the Government would have to prove if you went to trial.

4          Do you have any questions about that?

5          **THE DEFENDANT:**  No, ma'am.

6          **THE COURT:**  You understand, when you plead guilty,

7  you're admitting that?

8          **THE DEFENDANT:**  Yes, ma'am.

9          **THE COURT:**  And your lawyers say you do not want to

10  withdraw your guilty plea; is that right?

11          **THE DEFENDANT:**  Yes, ma'am.

12          **THE COURT:**  Okay.  Be seated.

13          I will hear from counsel as to how I should consider

14  the statements made by the Defendant in going forward.

15          Ms. McFadden?

16          **MS. McFADDEN:**  Your Honor, I think based on -- let me

17  put it this way.  I'm not entirely surprised that we find

18  ourselves in this position today just because of the indicators

19  I suggested -- or pointed out in the PSR earlier and some of

20  the statements in the letters that indicated there was effort

21  to split the baby, so to speak; right?  We're saving the

22  Government the time and the burden of a trial.  We're getting

23  the benefits of that in terms of the guidelines range, but also

24  we're not acknowledging the nature of the conduct, that it was

25  wrong, that it was known at the time that it was wrong.

       US v. Timothy Norman  -- Sentencing -- 6/2/22

          **THE COURT:**  I think he's clearly admitted that he now

knows it was wrong.  I do think he has admitted that clearly.

But the other part, I think you're exactly right.

          **MS. McFADDEN:**  And I think Your Honor's point is well

taken, because that's not nothing.  That is an important

factor.  Obviously, it's -- I don't think it puts you over the

finish line in terms of the factors for acceptance of

responsibility necessarily, but I do think this case, as I

referenced earlier, you know, related to what the guidelines

range would have been had the other counts of conviction been

guilty pleas or -- excuse me -- the other counts charged had

been guilty pleas -- and so I think at the end of the day,

wherever the Court lands on Mr. Norman's sentence, I do think

it is appropriate to factor in the fact that he now recognizes

it's wrong, the fact that there was not the time or burden to

the Government, to the Court, and to society in trying the

case, but also this is not a full-throated recognition and

grappling with the conduct.

          I think if the Court were inclined to remove the

levels of reduction for acceptance of responsibility, the facts

would support that, but I would tell the Court it would not

change the sentence that I am requesting today that the Court

impose.

          **THE COURT:**  Yeah, I think your argument already that

you made earlier took into account some of the qualifiers that

1    just became explicit a little later.

2         MS. McFADDEN:  As always, the Court puts it much more

3    succinctly than I did.  I think that is the case.  I'm happy to

4    answer any questions from the Court, but that would be my

5    position.

6         THE COURT:  All right.  Thank you.

7         Mr. Howard?

8         MR. HOWARD:  Your Honor, to the extent the Court may

9    be contemplating withdrawing credit for acceptance of

10   responsibility, I would point out that in Section 3E1.1 it

11   makes clear --

12        THE COURT:  3D1.1; correct?

13        MR. HOWARD:  I'm looking at 3E1.1.

14        THE COURT:  3E.  Okay.  I just -- I didn't hear you,

15   and I knew the court reporter didn't.  So I was repeating it,

16   and I apparently misspoke.  I got the wrong one.

17        MR. HOWARD:  I'm sorry.

18        It's a multifactor analysis.  So truthfully admitting

19   the conduct is normally the one that's the coin of the realm,

20   and I understand that, but the text of the application notes

21   include other things, such as voluntary assistance with

22   authorities, which we've explained at sidebar with

23   Ms. McFadden, did happen.  Voluntary resignation from the

24   office at issue, that happened; he voluntarily resigned from

25   the highway patrol when he was arrested.  The other factors

US v. Timothy Norman  -- Sentencing -- 6/2/22

here can substantiate and address the acceptance of
responsibility credit in his favor.

The last thing I would explain to the Court is when
Mr. Norman was giving his colloquy, he was reading from bullet
points that he still thinks he got right, and he just -- he's
struggling to articulate the culpability and the mental state
issues. And then when you afforded us the opportunity, we
explained to him what he needed to clarify, and he thinks he
did that again. Mr. Dowling and I know he didn't.

So this is not our recalcitrant defendant. He's not
trying to walk away from his acceptance. He is just struggling
to articulate it.

**THE COURT:** All right. So every case where somebody
is looking at a felony conviction -- well, even a misdemeanor
for that matter -- you know, these are matters that have real
consequences for people. I know that. They're serious. Every
case has its individual circumstances, its individual tragedies
usually. Sometimes the tragedies happen long ago in the past
and explain something of the criminal conduct, and sometimes
the tragedy is the decisions that led to the criminal conduct
or that are bound up in the criminal conduct.

And, you know, this case is very sad. Mr. Norman did
things and made choices that are going to affect him and his
family for years to come. They don't ruin his life going
forward. He's not going to be in prison for the rest of his

US v. Timothy Norman  -- Sentencing -- 6/2/22

1 life. He's not going to be under a criminal justice sentence

2 for the rest of his life, but I appreciate that the

3 consequences are long term.

4          I try to approach every sentencing seriously,

5 listening to all of the evidence, and I believe I have done

6 that here.

7          The guidelines, you know, are very helpful. Here

8 they do take into account, you know, the basic nature of the

9 offense, the firearms offense. They take into account the

10 scope of it with the number of guns and the fact that he was

11 trafficking in guns.

12          And, you know, the plus-two for abuse of trust, you

13 know, I appreciate the Defendant's arguments on that, but if

14 you don't give him that plus-two enhancement, then you're

15 almost ignoring the fact that there's something worse about

16 selling firearms for a profit to people you don't know or to

17 somebody you know is irresponsible. When you're a state

18 trooper, there's just something about that that is aggravated,

19 even if you're not using your position to do it. Now, he did

20 do that here. He used his position, I think, to obtain his

21 firearms and the protections it afforded to obtain specifically

22 firearms with extra value to the buyer. But, you know, if you

23 don't consider that, you still have something of an aggravated

24 situation, it seems to me. People who are supposed to be

25 enforcing the law ought not to be out there breaking it in ways

US v. Timothy Norman  -- Sentencing -- 6/2/22

1 that violate the public trust.

2         You know, I have tried to evaluate all of the
3 arguments and think about the best thing to do to take into
4 account the degree to which Mr. Norman has accepted
5 responsibility.  I'm not going to revise the guideline
6 calculation.  I believe that I could and I do think it is
7 appropriate for me to take into account in deciding what an
8 appropriate sentence the qualifications to his acceptance, but
9 he has admitted his guilt, at least in theory.  He's admitted
10 most of the conduct.  He clearly knows now that what he did was
11 wrong and has expressed remorse for that, and he did not put
12 the Government to the expense of a trial.  As Mr. Howard points
13 out, he resigned early.  He's cooperated -- all of these
14 things.

15         So I think I'm just -- I am going to give him
16 acceptance of responsibility.  I am not going to revise the
17 guidelines.  You know, I don't want to send him to prison for
18 the statutory maximum, which, as I recall -- let me just look
19 at it again.  Yeah, it's five years, and I think that would be
20 excessive in the case.

21         I am very concerned about his inability to fully
22 acknowledge that he knew what he was doing was wrong when he
23 did it.  The evidence is clear that he did know it, that he
24 shouldn't have been doing that.  I mean, how could he not know
25 it?  He's a state trooper.  He knows firearms are regulated.

US v. Timothy Norman  -- Sentencing -- 6/2/22

He's bought dozens of firearms. He signed many of those forms.
He knows it is illegal for felons to have guns. Maybe he
didn't know, I don't know if he did or not, that Mr. Hudson was
a felon, but he certainly knew a lot about Mr. Hudson and that
he was not somebody who ought to have a lot of guns. And he
knew nothing about this other buyer.

He knows this is wrong, and he's not able to admit it
to himself or perhaps to the people in the courtroom who love
him and care about him and think well enough of him, and he
doesn't want them to think less of him, and I understand that,
that he can't admit it to them. But the fact is he can't seem
to really admit it, and that's concerning.

So I've weighed all of these things. I've looked at
the Defendant's arguments for probation or a below-guideline
sentence. Some of these facts are, you know, very important.
He has complied fully with house arrest and home confinement
for several months. No criminal history. That's, of course,
taken into account by the guidelines. An admirable employment
record, law enforcement record, lots of damage to his
reputation, obvious community support. I appreciate all these
folks being here. It's a good sign for his future and for
what's going to happen when his sentence is -- you know, when
he moves to the next stage.

The collateral consequences for him are dramatic, as
they are for anybody who pleads guilty to a felony in federal

1    court.  I don't know that they are much worse for him.  You

2    know, there are lots of people out there who use guns -- or own

3    guns and possess guns, and it's important -- an important part

4    of their life who can't do it after their -- after they have

5    been convicted of a felony.

6           The disparity, I don't give that a huge amount of

7    weight.  It's anecdotal evidence.  I appreciate it.  I recall

8    putting one person on probation for this offense, but the facts

9    were very unusual.  I believe it was only one or two guns, and,

10   otherwise, I think I have sent people to prison.  I can only

11   really try to be consistent with myself, and every case is

12   different.

13          I do appreciate the Defendant's point about how law

14   enforcement officers are treated in prison.  You know, I agree

15   he is unlikely to recidivate, assuming he can come to terms

16   with acknowledging what he did, but there are some pretty

17   strong factors here for an active sentence.  The conduct is

18   very serious.  He's selling guns, one, to somebody he doesn't

19   know and to somebody else who he knows is -- ought not to have

20   a lot of guns -- ought not to have guns at all, whether he

21   knows he is a felon or not.  He knows that guns in the hands of

22   the wrong people hurt people.  He knows that guns are

23   regulated.  It's very serious.  He did this, you know, at least

24   ten times we know successfully.

25          There is a general deterrence component to this.  Law

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  enforcement officers need to know that they are subject to the

2  same laws that everyone else is subject to.  They don't get

3  treated differently because they're law enforcement officers.

4  In fact, if they do get treated differently, it's because their

5  breach of trust is more serious, their breaking the law is more

6  serious.  They need to know if you sell firearms and it's

7  against the law, that there are going to be serious

8  consequences for you, not just what I think many people would

9  see as a slap on the wrist if he doesn't go to prison.

10         So when I weigh all of these things, probation is

11  just not on the table.

12         I have evaluated the request for time served, which

13  is, as Mr. Howard said, basically the same thing as probation.

14  For the same reason, I don't feel comfortable with that.

15         I have looked at the possibility of imposing a

16  below-guideline sentence, and, you know, there's some things

17  that maybe support that.  I have been over some of them.

18  Mr. Howard went over them with me, and those all -- many of

19  them are deserving of substantial weight, but I have to take

20  into account the countervailing factors, which I've summarized

21  already:  The seriousness of the offense, the need for

22  deterrence, respect for the law.

23         I think it's important that I take into account his

24  inability to admit that he knew what he was doing was wrong

25  when he did it, and I just don't see -- many of the mitigating

US v. Timothy Norman  -- Sentencing -- 6/2/22

factors are taken into account in the guidelines, and those
that aren't I think do not weigh heavily enough for a
below-guideline sentence.

A low-end sentence of the guidelines is entirely
appropriate.  It takes into account all of the mitigating
factors that aren't taken into account by the guidelines.  And
it's serious.  It's real punishment, which is appropriate for
what he did.  He's putting guns out there into the community in
the hands of people who are doing who knows what with them, and
all of this while he is a sworn law enforcement officer.  I
just can't see that a below-guideline sentence is appropriate,
but a sentence at the low end is appropriate in light of his
lack of a criminal history, the acceptance he has shown, even
though it's a little limited.

And, you know, part of the reason I didn't change his
acceptance is, I mean, I just can't see giving him a longer
sentence than the minimum here.  That just seems like it would
be excessive under all the circumstances.  I'm certainly taking
the guidelines into account, but I've tried to look at this
realistically, too, in light of what he actually did.  I have
no reason to think he was out there selling guns every single
day to every Tom, Dick, and Harry that asked him for them.
There's no reason to think he did that.  I don't think he sold
86 guns, but I do think he made more than 24 available to
people.  And, you know, this conduct occurred over time with

US v. Timothy Norman  -- Sentencing -- 6/2/22

1   two buyers that we know of, so very serious.

2          I believe I have addressed the arguments.  Did I fail

3   to mention any of the Defendant's -- I think -- I believe I

4   covered them all.  I just want to be clear that I have

5   considered all of the arguments made by the Defendant because I

6   have.

7          All right.  Stand up, Mr. Norman.

8          For the reasons stated, the Court sentences the

9   Defendant to 37 months in the custody of the Bureau of Prisons.

10         He must pay a 100-dollar special assessment.  That's

11  due and payable immediately.  If he cannot comply, the Court

12  recommends the Inmate Financial Responsibility Program.

13         I am going to impose a fine.  I think $15,000 is

14  sufficient.  That's the bottom end of the guidelines.  He has

15  the financial resources to pay a fine.  I am going to waive

16  interest on the fine.  I considered the Government's request

17  for a higher fine, but, you know, he's going to be in prison

18  for a while, and that has financial consequences for his

19  family.  And when he gets out, you know, he needs to be in the

20  best position he can be to be successful, so I think $15,000 is

21  sufficient.

22         I will recommend he be housed as close as possible to

23  his family in Guilford County; right?

24         **MR. HOWARD:**  Yes.

25         **THE COURT:**  Yes.  And I will place him on supervised

US v. Timothy Norman  -- Sentencing -- 6/2/22

77

```
1  release.  I believe three years is appropriate in view of the
2  difficulties he's had accepting responsibility for this, and
3  it's just good to be sure we got the warrantless searches for
4  that period of time, given how important firearms are or have
5  been in his life.
6           He must comply with the mandatory conditions.
7           I'm not going to waive the drug testing.  I think
8  it's good to have that.  There's some indication of drug use.
9  He takes a good bit of prescription medicine for chronic pain.
10 I want to be sure there's no abuse of that going on.  There is
11 some indication that maybe that was happening.  So we don't
12 want him to have any of those problems when he gets out.  It
13 can certainly interfere with rehabilitation.
14          He will need to comply with the standard conditions.
15 They are set forth in the presentence report and in the
16 sentencing guidelines.
17          Do I need -- and you have a copy of them there?
18          MR. HOWARD:  I do, Your Honor.
19          THE COURT:  Do I need to repeat them, or is it
20 sufficient for me to adopt them by reference?
21          MR. HOWARD:  I am familiar with the Fourth Circuit's
22 recent focus on that issue, and we would stipulate that it's
23 fine to incorporate them by reference, and I will also review
24 them with him.
25          THE COURT:  I will incorporate those by reference.  I
```

US v. Timothy Norman  -- Sentencing -- 6/2/22

Case 1:21-cr-00373-CCE   Document 67   Filed 06/23/22   Page 77 of 81

1  will also adopt and incorporate in full the recommended special

2  conditions set forth in the presentence report.  I am going to

3  summarize those.

4          He will need to provide financial information to the

5  probation officer.  Since there was some financial motivation

6  for this crime, that's appropriate.

7          Cooperatively participate in a mental health

8  treatment program.

9          The fine, I'm not -- I'm making it higher than

10 Probation recommended; but if he doesn't get that paid off

11 before his release, he will need to pay that in equal monthly

12 installments of $100 to begin 60 days after he's released, but

13 he does have to pay it in full.

14         And he'll need to submit to warrantless searches on

15 reasonable terms.

16         Is that an adequate summary of the special

17 conditions?

18         **MR. HOWARD:**  We believe so, Your Honor.

19         **THE COURT:**  Is that sufficient from the Government's

20 perspective?

21         **MS. McFADDEN:**  Yes, Your Honor.

22         **THE COURT:**  I will dismiss Counts Two and Three

23 pursuant to the plea agreement.  There is an appeal waiver as

24 part of the plea agreement, which I didn't mention in terms of

25 the acceptance of responsibility, but I did, in fact, take into

US v. Timothy Norman  -- Sentencing -- 6/2/22

account.  I forgot to say it.  And that is an additional
indicator of acceptance of responsibility.  But if he believes
there is a basis to appeal that was not covered by that waiver,
he has to do that in writing within 14 days of the entry of the
Court's judgment.

          Now, is there any reason he cannot self-report?

          **MS. McFADDEN:**  No, Your Honor.

          **MR. HOWARD:**  That would be very gracious, Your Honor.

          **THE COURT:**  I will allow him to self-report.

          What I am doing these days?

          **THE CLERK:**  Six weeks.

          **THE COURT:**  Things change with the Bureau of Prisons
and designations, but I believe July 14, 2022, at noon to the
designated facility or to the Marshals' Office here in this
building.

          Have I forgotten anything, or is there anything I
need to address?

          **MS. McFADDEN:**  Your Honor, we just ask for an order
of the destruction of the firearms and ammunition seized in
this case if a lawful owner cannot be located for those.

          **THE COURT:**  Did you want to be heard?

          **MR. HOWARD:**  With the specific -- and I want this to
be clear to Mr. Norman, Your Honor, that Ms. McFadden has said
if the lawful owner cannot be identified.  We'll continue to
work with them on that.  Otherwise, no objection.

          US v. Timothy Norman  -- Sentencing -- 6/2/22

1    **THE COURT:**  All right.  So ordered.

2        I think I might have forgotten.  I accept the plea

3  agreement.  My notes reflected I did not do that at the Rule 11

4  hearing.  Let me just be explicit about that, that I have

5  accepted the plea agreement.

6    **MS. McFADDEN:**  Thank you, Your Honor.

7    **THE COURT:**  Mr. Norman, do you have any questions?

8    **THE DEFENDANT:**  No, ma'am.  I just apologize.

9        Thank you.

10   **THE COURT:**  All right.  Thank you.

11       Anything else for the Defendant?

12   **MR. HOWARD:**  Nothing from the defense.

13   **THE COURT:**  Let me look around.  Probation got

14 everything?

15       All right.  Nobody can think of anything that I have

16 forgotten?

17       This is a sad day, and I wish none of us were here.

18       The Court is adjourned until 2:00.

19   (END OF PROCEEDINGS AT 12:19 P.M.)

20

21                          * * * * * *

22

23

24

25

US v. Timothy Norman  -- Sentencing -- 6/2/22

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I,  Briana L. Bell, Official United States Court

7  Reporter, certify that the foregoing transcript is a true and

8  correct transcript of the proceedings in the above-entitled

9  matter prepared to the best of my ability.

10

11         Dated this 22nd day of June 2022.

12

13

14  _____

15  Briana L. Bell, RPR
    Official Court Reporter

16

17

18

19

20

21

22

23

24

25

US v. Timothy Norman  -- Sentencing -- 6/2/22